UNITED STATES v. INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, et al.

Civ. A. No. 1379—48.

District Court of the United States for the District of Columbia.

April 19, 1948.

Supplemental Opinion April 20, 1948

564

H. Graham Morison, Asst. Atty. Gen., Joseph M. Friedman, Sp. Asst. to Atty. Gen., Samuel K. Abrams, Atty., Department of Justice, and George Morris Fay, U. S. Atty., both of Washington, D. C., for plaintiff.

Welly K. Hopkins, of Washington, D. C., T. C. Townsend, of Charleston, W. Va., Harrison Combs, of Washington, D. C., and M. E. Bioarsky, of Charleston, W. Va., for defendants.

GOLDSBOROUGH, Justice.

The Court delivered the following opinion orally in overruling the motion of the defendants to discharge tnd vacate the Rule to Show Cause why the defendants should not be held in contempt, and holding the defendants guilty of contempt:

Gentlemen, the matter before the Court this morning is the verdict of the Court on the contempt proceeding which were tried in this Court last week, and concluded, I believe on Thursday morning.

This controversy arose upon the question of pensions to miners. The United Mine Workers of America, and its President, Mr. Lewis, desired that the miners who had been employed for 20 years and were 60 years old should have a pension of $100 a month regardless of whether or not they were presently employed.

The Court, of course, thinks that that was a worthy objective and if that was the matter before the Court it would receive very sympathetic consideration. But that is not the matter before the Court. The matter before the Court is whether or not the defendants refused to obey a lawful order of this Court.

Under an act passed in 1947 which is commonly known as the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., the President, if he is advised that a cessation of work or a strike imperils the national health or safety, shall appoint a Board of Inquiry; they shall pass upon the facts after investigation, make no recommendations and report the factual situation as they understand it, to him.

On the 23rd of March, I think, the President appointed such a board. The board reported to him on March 31st that a cessation of work in the bituminous mines was in process, and that the cessation of work in the bituminous mines which was then in process did imperil the national health and safety.

During the course of that inquiry one of the witnesses subpoenaed to testify before the Board was the individual defendant, John L. Lewis, President of the United Mine Workers. He failed to comply with the subpoena and then an order was served on him which he obeyed, and his testimony was a part of the material which the Board of Inquiry had and upon which they based their conclusion.

On April 3rd, the President, acting under the provisions of the Taft-Hartley Act, directed the Attorney General to file a complaint for an injunction against the United Mine Workers prohibiting what he deemed to be a strike, and on the evening of the 3rd of April this Court issued a preliminary restraining order ordering that the strike cease until the merits of the controversy could be decided in the injunction proceedings. In other words, in the simplest sort of language, it ordered that the status quo be resumed, that is, that the miners go back to work and that then the Court would ascertain, after full judicial investigation, whether or not the national health and safety was imperiled by the walk-out. If it was not, the Court would allow the miners to stay out, or go out.

On the other hand, if it was, they would have to go back into the mines.

Now, of course, in order for an injunction to be effective there would have to be a strike. The United Mine Workers and their President claim that there was no strike. They defend on certain constitutional grounds and claim that the miners left the mines entirely of their own volition and without any instructions from the President, direct or indirect. That is the matter which has to be sifted in this inquiry. Obviously, if as a matter of fact no strike was called, while the restraining order should have been obeyed, yet the penalty for its disobedience would very naturally be very slight; it would be very small.

On February 2nd the President of the United Mine Workers wrote the following

letter to all signatories to the National Bituminous Coal Wage Agreement of 1947. That Agreement was made, as I remember it, early last fall.

"The National Bituminous Coal Wage Agreement of 1947 required, among other things, the designation of a pension fund (out of the United Mine Workers of America Welfare and Retirement Fund) 'to be used for providing for pensions or annuities for the members of the United Mine Workers of America or their families or dependents and such other persons as may be properly included as beneficiaries thereunder.'

"On this date, seven months after the effective date of the Agreement, Your Representative Trustee, Mr. Ezra Van Horn of Cleveland, Ohio, continues (as he has consistently continued) to thwart the fulfillment of that contractual obligation. It now constitutes an outstanding, unresolved dispute, national in scope and character, affecting the integrity of the contract and impeding its fulfillment."

Now, what follows is what the Court thinks is a very significant sentence.

"The United Mine Workers of America, therefore, now advise you as a signatory to the Agreement that it reserves the right at will to take any independent action necessary to the enforcement of the contract. Signed, John L. Lewis, President, United Mine Workers of America."

On March 12th a letter was written to the officers and members of all the local unions in all bituminous districts in the United States, by Mr. Lewis, signed as Trustee, United Mine Workers of America, Welfare and Retirement Fund and also as President of the United Mine Workers of America. It is a long letter. The Court doesn't think it is necessary to read all the letter. But the following statement is made at its conclusion:

"The winter is now gone. This office proposes to go forward in requiring the coal operators to honor their agreement. Your ears will soon be assailed by their outcries and wails of anguish. To relieve themselves, they need only to comply with the provisions of the Agreement which they solemnly executed in this office on July 8, 1947.

"Please discuss this matter in your local unions so that our membership may be fully advised. You will later hear more from this office on this subject."

That letter, dated March 12th, and which I suppose went out at that time, was received on March 13th, maybe sometime a little later, on the 14th, was followed immediately on the 15th, I think it was, by a walk-out of some three hundred and fifty to four hundred and fifty thousand miners in the bituminous coal mines, 87 per cent of whom, according to testimony here, were members of the United Mine Workers Union.

The preliminary restraining order was served on the United Mine Workers of America on April 5th. On April 7th, after waiting two days, the Government filed a petition for a Rule to Show Cause why the United Mine Workers of America should not be held in contempt. On the same day the United Mine Workers of America filed a motion to dismiss the preliminary restraining order.

On last Monday, at 10 o'clock—maybe 5 minutes to 10; approximately 10 o'clock— the United Mine Workers of America filed their answer to the petition of the Government asking that they be held in contempt.

Now, the answer was based, practically speaking, on two grounds. The answer claims that the First, the Fifth, and the Thirteenth Amendments of the Constitution were violated by the issuance of the restraining order.

The First Amendment is an amendment which permits free expression of speech, that is, any legitimate expression of speech.

The Fifth Amendment provides for due process of law.

The Thirteenth Amendment prohibits involuntary servitude.

I presume the theory of the claim that the restraining order was in violation of the Fifth Amendment is that it was issued without a hearing, and it is evidently claimed, although it was not argued, that it was mandatory in character, and there-

fore should not have been issued without a hearing.

It appears on the surface, and only on the surface, to be mandatory in character, that is, in the nature of a mandamus. Certainly a preliminary restraining order would have been legal if irreparable injury had been demonstrated by the petitioner, if it had been prayed for prior to the walk-out.

It is an emergency legal measure and there is just as much reason for its issuance after the walk-out as before. What it did was to state facts and attach affidavits which were sufficient to indicate that irreparable injury would happen to the country if the walk-out was allowed to continue, just as it would have said, if it had been issued prior to the strike, that irreparable injury would be the outcome if a walk-out occurred.

So that, as a matter of fact, legalistically speaking and practically speaking, it was simply an order to return to the status quo, return to the position that the parties were in until the Court could determine in the injunction proceedings whether or not the peace and security of the country were imperiled by the walk-out.

So much for the objection on constitutional grounds as to the Fifth Amendment. As to the First Amendment, providing for liberty of speech, it has never been held by any court that an injunction to prevent a strike was a deprivation of the liberty of speech, nor has it ever been held, insofar as the Thirteenth Amendment is concerned, that an injunction preventing a strike constituted involuntary servitude, or an injunction which ordered a strike to cease, involved involuntary servitude.

■ But the defendants' contention is this: That the First and the Thirteenth Amendments were violated because, as a matter of fact, no strike was called, no strike existed. These men, it is contended, did, as individuals, what they had a right to do, work or not to work, and they decided not to work.

Now, we have to consider the validity of that claim objectively. If a nod or a wink or a code was used in place of the word "strike," there was just as much a strike called as if the word "strike" had

been used. Now let us see. In the letter of February 2nd to the signatories to the National Bituminous Coal Agreement the following words were used:

"The United Mine Workers of America therefore now advise you as a signatory to the agreement that it reserves the right at will to take any independent action necessary to the enforcement of the contract."

What independent action could be taken by them, except strike? Now in the letter of March 12th, they say:

"The winter is now gone; this office proposes to go forward in requiring the coal operators to honor their agreement."

Go forward in what way? Any other way except strike?

"Your ears will soon be assailed by their outcries and wails of anguish. To relieve themselves they need only to comply with the provisions of the Agreement which they solemnly executed in this office on July 8, 1947."

Does that constitute a nod, or a wink, or the use of a code in order to call a strike? Is there any other reasonable interpretation?

And then this Court believes that there is a principle of law which, as far as I know, no Court has ever been called upon to announce, because this use of a code in order for a union to avoid responsibility is a new thing. It is a new method of endeavoring to avoid responsibility.

■ The Court thinks the principle is this: that as long as a union is functioning as a union it must be held responsible for the mass action of its members. It is perfectly obvious not only in objective reasoning but because of experience that men don't act collectively without leadership. The idea of suggesting that from 350,000 to 450,000 men would all get the same idea at once, independently of leadership, and walk out of the mines, is of course simply ridiculous.

So that, in general, this Court announces a principle of law. The Court has no means of knowing whether higher courts will adopt the principle or not, but the Court has no doubt about its soundness, not any— that a union that is functioning must be

held responsible for the mass action of its members.

You can't preserve a union any other way. And the unions are the only thing which labor has to give it comparable bargaining power with capital. It is the only thing which the employee has to give him equal or comparable bargaining power with his employer.

So that the rule of law which I have announced is the only rule which will preserve the unions, because if the plan is adopted throughout the country of trying to use a wink, a nod, a code, instead of the word "strike", and if that sort of a maneuver is recognized as valid by the Courts, then you will have among the unions lawlessness, chaos, and ultimate anarchy. And then the unions will have to be socialized. In other words, they will have to be destroyed.

So when the Court says that the Union must be held responsible, as long as it is functioning, for the mass action of its members, the Court is announcing a principle for the salvation of the Unions themselves and their preservation, and the only rule that will save them from destruction.

Of course, if a union comes in and says "We have lost our hold on our members; they have gone; John Smith has executed a coup; he has taken them away from us," and if they can show the Court by legitimate testimony that that is true, they are not guilty of contempt. But that is not the situation here.

The Union and its President make no such claim. They don't contend for one instant that this Union isn't operating and functioning as a union, and that its members are not controlled from headquarters.

And so the Court has no difficulty in reaching a conclusion.

The Court thinks that the following telegrams, issued by the Union, who had disregarded the temporary restraining order from April 5 to April 12, are also significant.

The first telegram is as follows, and it was issued prior to the meeting of the Court on last Monday; this is a wire sent to all district presidents and International board members, bituminous districts of the United Mine Workers of America of the United States:

"This message is for your official information and for immediate transmission to all members of the Union. The trustee vacancy in the 1947 Welfare Fund has now been filled by the selection of the Honorable H. Styles Bridges who has accepted the appointment. An early resolution of the question at issue may now be expected. Your voluntary cessation of work should now be terminated and your protest ended. It is the belief of the International Union and your officers that the production of coal should be resumed forthwith. It is to your best interests and those of our Union and the public welfare that this should be done. Therefore you are now officially advised that you should return to your usual employment immediately upon receipt of this telegram. This message is sent on behalf of the International Union as well as in my official capacity as President." ·

Then later in the morning this telegram was sent to all bituminous local unions, United Mine Workers of America:

"Pensions granted. The agreement is now honored."

You will notice, and it is in the evidence, that in the letter of March 12, which preceded what the Court now holds to have been a strike, the coal operators are charged with dishonoring their agreement. And in a telegram of April 12 the statement is made: "The agreement is now honored".

The miners walk out when told "The agreement is dishonored," and they go back when they are told "The agreement is honored."

Now, can that be anything else except a code, taken in connection with the other statements the Court has made of what has happened?

■ The Court thinks, gentlemen, that there is no difficulty about deciding that the evidence, beyond all reasonable doubt—practically beyond all doubt—is sufficient to show that a strike was called, and of course, is sufficient to show that the defendants are guilty of criminal contempt.

■■ They are obviously guilty of civil contempt in a technical manner. Civil

568

contempt is usually used to reimburse someone who suffered by the strike where an injunction is disobeyed.

Of course, in this case what any fine imposed for civil contempt would do would be to transfer money from the United Mine Workers to the United States Treasury. It would transfer the medium of exchange from one class to the whole people. But it would not salvage in any manner or to any extent the damage which the strike has caused. And so the Court doesn't particularly emphasize the civil aspects.

This, of course, is a tremendously important matter. The Court naturally has felt a tremendous responsibility resting upon it. What the Court does, or will do, in assessing punishment, and what the Court has done in holding these defendants guilty, is a matter which is being watched by every lawless element not only in this country, but in the world.

It is also being watched by all decent people to ascertain whether or not the Courts have power to protect citizens of this country in their normal way of life. The Court doesn't think this matter can be viewed from the standpoint of expediency. The Court thinks it should be acted upon as any other case is acted upon.

The Court also thinks it is not all-wise.

This action was instituted by the President of the United States, I mean it originated with him, and every individual in this country, including the miners, including the unions, has a stake in its proper determination and in the penalties imposed in regular course.

So that the Court is not going to pronounce sentence this morning. The Court is going to pronounce sentence tomorrow morning at 10 o'clock, and the Court asks the Government, tomorrow morning at 10 o'clock, to give the Court its recommendation. And of course, if the defendants also wants to make any statement, any recommendation, they will also be permitted to do it.

The Government has access, possibly to practical information that the Court doesn't have access to, which may be perfectly legitimate for them to consider in making their recommendation.

In closing, the Court is firmly convinced —firmly convinced—that this situation has gotten beyond the bound of expediency. The issue has to be met.

## Findings of Fact.

Upon consideration of the entire record, the briefs, and arguments of counsel, the Court finds that it has been established beyond a reasonable doubt that:

1. (a) On March 23, 1948, the President of the United States, acting under the provisions of section 206 of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 176 (hereinafter referred to as the "Act"), issued Executive Order 9939, whereby he created a Board of Inquiry to inquire into the issues involved in a labor dispute between coal operators and associations signatory to the National Bituminous Coal Wage Agreement of 1947 (hereinafter referred to as the Agreement), and certain of their employees represented by the International Union, United Mine Workers of America (hereinafter referred to as the Union), also signatory to the said Agreement, involving wages or terms and conditions of employment.

(b) In said Executive Order, the President expressed the opinion that such dispute had resulted in a strike affecting a substantial part of the bituminous coal industry, which he described as an industry engaged in trade and commerce among the several states and with foreign nations, and in the production of goods for commerce, and further expressed the opinion that said strike, if permited to continue, will imperil the national health and safety.

2. The Board of Inquiry so convened by the President inquired into the issues involved in the dispute and made its written report to the President on March 31, 1948. Such report included a statement of the facts with reference to the dispute, including each party's statement of its position, but contained no recommendation. After receipt and full consideration of the report, the President, acting under section 208 of the Act, 29 U.S.C.A. § 178, directed the Attorney General of the United States to institute this action on the part of the United States of America for an injunction against

the continuance of the strike and for other appropriate relief.

3. Thereafter, on April 3, 1948, the United States of America brought a suit against the International Union, United Mine Workers of America; John L. Lewis, as President, International Union, United Mine Workers of America, and as Union Representative Trustee, Board of Trustees, United Mine Workers of America Welfare and Retirement Fund; Ezra Van Horn, Operators' Representative Trustee, Board of Trustees, United Mine Workers of America Welfare and Retirement Fund; and operators and associations signatory to the said Agreement. The United States of America filed a verified complaint in which it asked that the defendant Union and its officers, agents, servants and employees, and all persons in active concert or participation with them, be enjoined from continuing the strike in existence at bituminous coal mines throughout the United States of America owned or operated by coal operators and associations signatory to the Agreement; that they be enjoined from engaging in, permitting or encouraging the said strike or its continuance; that the said Union, acting through its president and other appropriate officers, agents, servants and employees, be ordered to instruct all members of the said Union employed in mines covered by the Agreement to cease the said strike and to return to their employment forthwith; that the defendants and each of them be enjoined from engaging in a strike or lockout or from interfering with the orderly continuance of work at the said coal mines; that the defendants be ordered to engage in free collective bargaining as contemplated by the terms of the Agreement; that temporary injunctive relief be granted and for other appropriate relief, all as more fully set forth in the complaint..

4. Upon the filing of the verified complaint, and upon plaintiff's application, this Court at 7:30 p. m. on April 3, 1948, issued a temporary restraining order as prayed for by plaintiff, based upon the facts alleged in the complaint and upon affidavits filed in support of the application for the restraining order. The restraining order directed, inter alia:

"Now, therefore, it is by the Court this 3rd day of April 1948,

"Ordered that the defendant, International Union, United Mine Workers of America, hereinafter sometimes referred to as the Union, and its officers, agents, servants and employees, and all persons in active concert or participation with them, be and they are hereby restrained pending further order of this Court from continuing the strike now in existence at bituminous coal mines throughout the United States of America owned or operated by coal operators and associations signatory to the National Bituminous Coal Wage Agreement of 1947, executed at Washington, D. C., July 8, 1947, hereinafter referred to as the Agreement, and that the said defendant, International Union, United Mine Workers of America, and its officers, agents, servants and employees, and all persons in active concert or participation with them, be and they are hereby restrained pending further order of this Court from in any manner engaging in, permitting or encouraging the said strike or its continuation;

"And it is further ordered that the said Union, acting through its president and other appropriate officers, agents, servants and employees, forthwith instruct all members of the said Union employed in the bituminous coal mines covered by the Agreement to cease the said strike and immediately to return to their employment and that the said Union, acting through the said officers, agents, servants and employees, cease, desist and refrain from ordering, encouraging, recommending, instructing, inducing or in any wise permitting the said strike to continue;

"And it is further ordered that the defendants and each of them and their officers, agents, servants and employees, and all persons in active concert or participation with them, be and they are hereby restrained pending further order of this Court from encouraging, causing or engaging in a strike or lock-out at any bituminous coal mines covered by the agreement, or from in any manner interfering with or affecting the orderly continuance of work at the said coal mines, and from taking any action which

570

would interfere with the Court's jurisdiction;"

The restraining order by its terms provided that it would expire at 7:30 p. m. on April 13, 1948, unless extended.

5. Certified copies of the verified complaint, affidavits annexed thereto, and of the said restraining order were duly published and served upon the said defendants, International Union, United Mine Workers of America, and John L. Lewis, as President, International Union, United Mine Workers of America, and as Union Representative Trustee, Board of Trustees, United Mine Workers of America Welfare and Retirement Fund, by Deputy United States Marshal Harold W. McCauley at 11:22 a. m., Monday, April 5, 1948.

6. On April 7, 1948, the defendant Union and the defendant, John L. Lewis, as President, International Union, United Mine Workers of America, and as Union Representative Trustee, Board of Trustees, United Mine Workers of America Welfare and Retirement Fund, moved that the Court dissolve and vacate the temporary restraining order theretofore issued and in support of said motion annexed the affidavit of John L. Lewis and a memorandum of points and authorities.

7. On April 7, 1948, the United States of America, by its Attorney General, filed a verified petition for a rule to show cause why the respondent Union and the respondent John L. Lewis should not be punished as and for a contempt of this Court, alleging that the respondents, with full knowledge of the terms of said restraining order and in defiance thereof, had knowingly, wilfully, wrongfully and deliberately disobeyed and violated so much of the said temporary restraining order as is set forth in its entirety in paragraph 4 hereof.

8. On said verified petition, the Court on the same day issued a rule to show cause, ordering said respondents to appear before this Court at 10:00 o'clock a. m. on April 12, 1948, to show cause why they should not be punished as and for contempt of this Court. It was further ordered that if, upon the return of said respondents, it should be found that the alleged contempt had not been sufficiently purged, a trial should be held at 10:00 o'clock a. m. on April 14, 1948.

9. On the return day the said respondents filed their answer to the rule to show cause and annexed to the said pleading the affidavit of respondent, John L. Lewis, and a memorandum of points and authorities. By reason of constitutional, statutory and procedural objections set forth therein, the respondents asked that they, and each of them, be fully discharged of and from the rule to show cause and that the rule be vacated, dismissed and fully discharged.

10. On the return day, the respondent Union and respondent John L. Lewis made their appearances in open court through counsel and made oral response to the rule to show cause in substance as set forth in their written answer. Defense counsel included in such oral response a statement of the following allegations:

(a) That at 11:00 o'clock a. m. on April 10, 1948, respondent John L. Lewis acceded to a request from the Speaker of the House of Representatives of the Congress of the United States that Honorable H. Styles Bridges, a member of the United States Senate, be appointed as the third and neutral trustee of the United Mine Workers of America Welfare and Retirement Fund.

(b) That at 10:00 o'clock a. m. on April 11, 1948, a meeting of the Board of Trustees of the said Fund as newly constituted was held and that a second meeting of the Board was held on the morning of April 12, 1948; and that an adequate and equitable pension plan has been adopted by the Board.

(c) That on the morning of April 12, 1948, a telegram was dispatched to each District President and all members of the International Executive Board of the International Union, United Mine Workers of America as follows:

"This message is for your official information and for immediate transmission to all members of the Union. The Trustee vacancy in the 1947 Welfare Fund has now been filled by the selection of The Honorable H. Styles Bridges who has accepted the appointment. An early resolution of the questions at issue may now be expected.

Your voluntary cessation of work should now be terminated and your protest ended. It is the belief of the International Union and your officers that the production of coal should be resumed forthwith. It is to your best interests and those of our Union and the public welfare that this be done. Therefore, you are now officially advised that you should return to your usual employment immediately upon receipt of this telegram. This message is sent in behalf of the International Union as well as in my official capacity as President.

> "John L. Lewis
> "President, United Mine Workers of America."

(d) That on the morning of April 12, 1948, the following telegram was also dispatched:

"To All Local Unions:

"Pensions granted. The agreement is now honored.

> "John L. Lewis"

(e) That since April 8, 1948, duly accredited representatives of respondents have been meeting with representatives of bituminous coal mine operators.

11. Thereupon, the Court, finding that criminal and civil contempt had been alleged and that the alleged contempts had not been sufficiently purged by the respondents' return, ordered that the matter be set down for trial on April 14, 1948. At the same time, the Court, upon application by plaintiff and for good cause shown, extended the said temporary restraining order to 10:00 o'clock a. m. on April 23, 1948.

12. On April 14, 1948, the said respondents moved orally in open court to dismiss the rule to show cause upon the following grounds:

(1) That said rule was not in conformity with Rule 42(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. following section 687, which requires among other things, that "the notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such";

(2) That such rule should be dismissed for each and all of the several reasons assigned in the answer to the rule to show cause previously filed.

This motion was denied by the Court.

13. Thereupon, the respondents, and each of them, entered their pleas of not guilty to the charge of civil contempt and their pleas of not guilty to the charge of criminal contempt and the case proceeded to trial before the Court.

14. The respondents were, before the trial, apprised of the fact that they were charged with both a civil and criminal contempt; were advised in advance of trial of the names and identities of witnesses to be called by the complainant; and were fully and adequately informed of all facts pertinent to the charge of civil and criminal contempt.

15. A full and complete hearing extending over April 14 and 15, 1948, was had, at which the parties were given full opportunity to present evidence, to cross-examine witnesses, to present argument, and to avail themselves of any and all rights to which they might be entitled.

16. Throughout all hearings on this matter, commencing with the hearing on April 14, 1948, respondent Lewis was personally present before this Court.

17. The respondent Union and the respondent John L. Lewis, after the service upon them of the Court's temporary restraining order, beyond a reasonable doubt, wilfully, wrongfully and deliberately disobeyed and violated so much of said order of the Court as is set for in paragraph 4 hereof.

18. (a) On March 12, 1948, the respondent Union, in a letter signed by respondent John L. Lewis, as its President, wrote to all officers and members of all local unions in all bituminous districts of the United States. That letter outlined the course of the dispute concerning the establishment of the pension fund and included the following statement: "For eight months the bituminous coal operators, through their Trustee, Ezra Van Horn of Cleveland, Ohio, have dishonored the 1947 Wage Agreement and

defaulted under its provisions affecting the Welfare Fund."

(b) The letter of March 12, 1948 was written and sent with the express purpose of ordering, calling, and causing a strike on the part of the Union against the operators and associations signatory to the Agreement.

(c) The effect of the transmittal of the letter was to cause the said strike.

19. During the period between March 15, 1948 and March 18, 1948, members of the said Union, acting in concert, walked out from their employment at bituminous coal mines throughout the United States owned or operated by operators and associations signatory to the said Agreement. By the latter date, a strike affecting a substantial part of the bituminous coal industry of the United States was in progress and was being carried on by the said Union against the said operators and associations signatory to the Agreement.

20. The walkout on the part of the Union as set forth in paragraph 19 hereof was a strike as defined by section 501(2) of the Act, 29 U.S.C.A. § 142(2).

21. The walkout as set forth in paragraph 19 hereof did not constitute the exercise of the right of individual employees to quit their labor, as set forth in section 502 of the Act, 29 U.S.C.A. § 143, but was a strike on the part of the Union.

22. The strike described above was one affecting a substantial part of the bituminous coal industry of the United States.

23. The bituminous coal industry is engaged in trade and commerce among the several states and with foreign nations and in the production of goods for commerce.

24. The strike, if permitted to continue, will imperil the national health and safety.

25. The strike has caused irreparable injury to the United States and to the industry and economy of the United States.

### Conclusions of Law.

1. The statutory provisions of sections 206 to 208 of the Act, and all requirements therein contained, were duly and legally carried out both prior to and in the institution of this action by the United States of America.

2. Beginning March 15, 1948, the Union carried on a strike in the bituminous coal mines of the United States owned or operated by operators and associations signatory to the said Agreement, within the meaning of the Act.

3. The walkout on the part of the Union was a strike as defined by section 501(2) of the Act.

4. The walkout on the part of the Union did not constitute the exercise of the right of individual employees to quit their labor, as set forth in section 502 of the Act, but was a strike on the part of the Union.

5. The said strike affected a substantial part of the bituminous coal industry which is engaged in trade and commerce among the several states and with foreign nations, and in the production of goods for commerce, within the meaning of the Act.

6. The strike, if permitted to continue, will imperil the national health and safety, within the meaning of the Act.

7. This Court has jurisdiction of the subject matter and of the respondents herein.

8. By reason of the facts found in paragraphs numbered 4 through 19 above, the respondents, and each of them, have, since the service upon them on April 5, 1948, of the temporary restraining order of this Court, beyond a reasonable doubt, wilfully, wrongfully and deliberately disobeyed and violated the terms of the said temporary restraining order, and have obstructed and interfered with the determination of this case by the Court.

9. The respondent Union, since the service upon it on April 5, 1948, of the temporary restraining order, has, beyond a reasonable doubt, been guilty is now guilty of a criminal contempt of this Court.

10. The respondent Union, since the service upon it on April 5, 1948, of the temporary restraing order, has, beyond a reasonable doubt, committed a civil contempt of this Court.

11. The respondent John L. Lewis, as President of the Union, since the service upon him on April 5, 1948, of the temporary restraining order, has, beyond a reasonable doubt, been guilty and is now guilty of a criminal contempt of this court.

12. The respondent John L. Lewis, as President of the Union, since the service upon him on April 5, 1948, of the temporary restraining order, has, beyond a reasonable doubt, committed a civil contempt of this Court.

### Supplemental Opinion

(The Court then requested the Government to suggest a penalty and also gave the defendants an opportunity to make any suggestions they saw fit. They did not care to make a statement.)

The Government suggested a fine against the individual defendant of $20,000, and against the defendant Union of $1,400,000.

Gentlemen, it is a very unusual thing, of course, for a Court to ask a party to a suit—a prosecuting party to a criminal action, or any action which involves punishment—what he thinks the penalty should be, but we have to accommodate ourselves to circumstances, and this is a very unusual situation. The welfare and the health and safety and the orderly way of life of 143 million people are involved, as well as the national prestige in foreign countries which must be sustained in view of the present international situation.

Now, if this Court were to use its individual judgment, it would impose a prison sentence on the individual defendant. But while the Court is a Court, the Court is only one man; it is only the judgment of one individual, and as I indicated yesterday the Government has access to reasons for judicial action in a case of this character which the Court does not have access to, so the Court feels that it should adopt a recommendation made by the Government unless it is of such a character as to shock the conscience of the Court.

The Court could give what the Court thinks are cogent reasons why the Court's conscience is not shocked by the suggestions made, but the Court thinks that all of this was covered by the Court yesterday and that it would serve absolutely no useful purpose to go over it again.

A fine is assessed against the defendant Union of $1,400,000 and against the individual defendant of $20,000 for criminal contempt.