**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Appellee,**

v.

**AMALGAMATED TRANSIT UNION, NATIONAL CAPITAL LOCAL DIVISION 689, et al., Appellants.**

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Appellee,**

v.

**AMALGAMATED TRANSIT UNION, NATIONAL CAPITAL LOCAL DIVISION 689, its members and individually, et al., Appellants.**

Nos. 74–1722, 74–1761.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 23, 1975.

Decided Feb. 25, 1976.

I. J. Gromfine, Washington, D. C., with whom Mark A. Rosen, Washington, D. C., was on the brief, for appellants.

Peter J. Ciano, Asst. Gen. Counsel, Washington, D. C., Washington Metropolitan Area Transit Authority, Washington, D. C., for appellee.

Before LEVENTHAL and ROBB, Circuit Judges, and SOLOMON,* United States Senior District Judge for the District of Oregon.

SOLOMON, District Judge:

The Washington Metropolitan Area Transit Authority (Transit Authority) operates the mass transit bus lines in and around Washington, D. C. The Amalgamated Transit Union, National Capital Local Division 689 (Union), is the bargaining agent for most of the employees of the Transit Authority.

When the Transit Authority took over four privately owned bus lines in January 1973,[1] it took over the collective bargaining agreement with the Union. This contract contained no-strike, compulsory arbitration, and "full percentage cost-of-living" clauses.[2] Before the contract expired on April 30, 1974, the Transit Authority and the Union engaged in extensive contract negotiations. When the Transit Authority sought to renegotiate the cost-of-living provision, the Union refused, contending that to do so would involve a "worsening" of employees' positions in violation of § 66(a) of the National Capital Transportation Act of 1972.[3] The Union also accused the Tran-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The enabling legislation was the National Capital Area Transit Act of 1972, 86 Stat. 999.

2. In the National Capital Transportation Act of 1972, 86 Stat. 464, compulsory arbitration of "any labor dispute" was required of the Transit Authority. "The term 'labor dispute' shall be broadly construed . . . ."

3. Section 66(a) reads in pertinent part:
". . . Such [future] employment [with the Transit Authority] shall not result in any worsening of the employee's position in his former employment nor any loss of wages, hours, working conditions, seniority, fringe benefits and rights and privileges pertaining thereto."

sit Authority of bargaining in bad faith because the Authority insisted that its proposals be unanimously endorsed by the Union's negotiating committee before they were submitted, as offers, to the membership for ratification.

On April 30, the Transit Authority demanded arbitration. On the same day, the Union's executive board, meeting secretly, voted to recommend a strike to the membership.

The following day, the Union agreed to arbitrate everything except the cost-of-living provision, which it contended was non-arbitrable as well as non-negotiable. Before the Transit Authority acted on this counter-proposal, the Union membership met that night and voted to strike commencing May 2, 1974, at 12:01 A.M.

Within minutes after the strike began, the Transit Authority obtained an ex parte, temporary restraining order restraining the Union and its officers from continuing the strike.

In spite of the temporary restraining order, the members refused to return to work. On the following day, May 3, the district court directed the Union as well as Davis and Richmond, its president and secretary-treasurer, to show cause by May 4 why they should not be held in contempt for disobeying the temporary restraining order.

That evening and most of the night Davis, Richmond, and other union leaders tried to persuade the members to return to work. Davis addressed a mass meeting attended by 2,000 members. He told them of the restraining order and urged them to return to work. The members refused, and the meeting broke up in confusion. That night, Richmond visited several garages and helped disperse picket lines, while Davis remained at union headquarters directing a telephone campaign. The members did not return to work.

On Saturday, May 4, the court held the Union guilty of contempt for disobeying the restraining order and fined the Union $25,000 a day commencing the next morning,

Sunday, May 5, at 8:00 A.M., unless by that time the work stoppage was ended and the contempt was purged. The court also found Davis guilty of contempt but made no mention of a fine or other penalty. The court praised Richmond and found him not guilty.

On Sunday, May 5, about half the normal number of buses went out. That afternoon the Union's executive board formally rescinded the strike recommendation.

On Monday, May 6, only a small number of buses went out. On the same day, the court entered a preliminary injunction, because the restraining order was scheduled to expire by its terms. The preliminary injunction continued the order adjudging contempt dated May 4 and ordered the Union fined $25,000 for each day during which the strike and work stoppage continued.

On Tuesday, May 7, service was substantially restored. Thereafter the Transit Authority and the Union negotiated a new contract. On June 21, more than a month after service was restored, the Transit Authority moved for a final contempt judgment against the Union but not against Davis individually.

The court heard arguments on the contempt motion on July 15. Counsel for the Transit Authority introduced a short affidavit which set forth that although 244 buses normally operated on Sundays, on Sunday, May 5, only 123 buses operated, and that although 1,500 buses normally operated on weekdays, on Monday, May 6, only 30 buses operated. On Tuesday, May 7, 1,277 buses operated, and normal service was restored on the following day.

At the hearing, counsel for the Transit Authority said:

"The affidavit . . . shows that less than full service existed after the court's finding the Union and Mr. Davis in contempt on May 4. And this existed for a two-day period . . . .

"Your Honor, that is our entire position."

The Union filed detailed affidavits setting forth the efforts that were made to comply with the restraining order and the preliminary injunction.

On the basis of the facts alleged in the affidavits, the Union contended that on Sunday, May 5, it substantially complied with the court's order when more than half of the buses operated and that full service would probably have been restored on that day except for the interference of the Transit Authority. The Authority insisted that only regular drivers take their regular runs, even though the Union had provided other willing and qualified drivers to take these runs.

The affidavits also formed the basis of the Union's contention that it was unable to comply with the court's order because of the disruptive activities of some dissidents within the Union and because of a group of outsiders who called themselves "Workers Action Movement" and who urged the membership to repudiate its leadership and engage in a rank and file strike.

The Transit Authority did not dispute the good faith of the Union leaders beginning May 3 and many of the members beginning May 4. Nor did the Transit Authority try to justify its refusal to use substitute Union drivers.

The trial court made no findings, either orally or in writing, on whether the Union had purged its contempt. Both in its questions and in colloquy with counsel, the court directed its attention solely to the pre-May 5 period. The court did not consider or make findings on whether the Union had substantially complied with the restraining order or whether the Transit Authority or others had interfered with the Union's attempt to return to work. The court accepted the Transit Authority's statistics on the reduced service and imposed a fine of $50,-000 on the Union and also imposed a fine of $100 (suspended) on Davis.[4]

The Union appealed from the preliminary injunction. The Union contended that the district court lacked jurisdiction because the Transit Authority failed to meet the "clean hands" requirement of Section 8 of the Norris-LaGuardia Act by not bargaining in good faith. 29 U.S.C. § 108.

■■■ The appeal from the preliminary injunction (No. 74–1722) is dismissed as moot. The Union concedes that it was required to obey the terms of the restraining order, on which the fines were based, even if that order was improvidently granted. The same is true of the injunction which incorporated the provisions of the temporary restraining order. The strike is over; the parties have reached an agreement; neither the temporary restraining order nor the injunction has any present vitality.[5]

The Union also appealed from the final contempt judgment and fine (No. 74–1761).

■■■ Every civil contemnor who asserts a genuine issue of material fact is entitled to a full, impartial hearing. *Brotherhood of Locomotive Firemen and Enginemen v. Bangor & Aroostook Railroad Company*, 127 U.S.App.D.C. 23, 380 F.2d 570 (1967).

At the July 15 hearing, the Union introduced detailed affidavits on substantial compliance and inability to comply. The offered evidence included the efforts of the Union officers to end the strike and interference by the Transit Authority or by outsiders with the Union's attempt to put all of the bus runs back in operation. The trial court made no written or oral findings of fact on these proffered defenses. From the court's comments at the July 15 hearing, it

---

**4.** Both the Union and the Transit Authority were confused on whether the fines, if any, were to be paid to the Transit Authority or into court. The court asked counsel for the Transit Authority for comment, and when its counsel said the Transit Authority was indifferent on where the fines were to be paid, the court ruled that the fines should be paid into court.

**5.** In constitutional terms a court in a labor dispute may act on issues that are capable of repetition. Nevertheless the court in such cases may apply principles of common law mootness and decline to decide issues that are not at present alive. *Delaware & Hudson Railway v. United Transportation Union*, 146 U.S. App.D.C. 142, 157, 450 F.2d 603, 617, *cert. denied*, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).

appears that it was of the view that, as a matter of law, the Union's defenses should not even be considered. The court limited its inquiries about the Union's compliance efforts to events that occurred before the fine started to accrue. It apparently adopted the Transit Authority's "entire position" that partial service on Sunday and Monday automatically equalled continuing contempt by the Union. In so holding, the court applied the mass action principle, that "as long as a union is functioning as a union it must be held responsible for the mass action of its members." *Vulcan Materials Co. v. United Steelworkers of America*, 430 F.2d 446, 455 (5th Cir. 1970).[6]

Union responsibility for actions of its members apparently contravening a court's orders is not absolute. The mass action principle establishes that a union can be held responsible for its members in proper circumstances, but does not revoke traditional defenses to a contempt adjudication. Either substantial compliance or inability to comply is as much a defense in coercive contempt proceedings arising out of a labor dispute as in any other civil contempt proceeding. *See Brotherhood of Locomotive Firemen and Enginemen v. Bangor & Aroostook Railroad Company, supra; see also Maggio v. Zeitz*, 333 U.S. 56, 68 S.Ct. 1275, 86 L.Ed. 1758 (1948). The court made no written findings of fact on either of these defenses, as ordinarily required by Fed.R.Civ.P. 52(a). This is not the "rare case" where appellate decision of the merits is possible without them.[7]

In presenting its defenses of substantial compliance and inability to comply, the Union also consistently asserted its good faith efforts to comply with the court's orders. The court did not consider good faith for any purpose. In a different context, this court has recognized that an equity court may consider whether a public official "has in good faith employed the utmost diligence in discharging his statutory responsibilities" in deciding whether to issue an order. *NRDC v. Train*, 166 U.S. App.D.C. 312, 510 F.2d 692 (1975). Evaluation of good faith efforts to comply, once raised, is necessary to determine the possibility of compliance.[8] In our view good faith should also be considered in mitigation of penalty.

Our statement in *Brotherhood of Locomotive Firemen and Enginemen v. Bangor & Aroostook Railroad Company, supra* at 582, is particularly applicable here:

"Certainly the history of contempt litigation, especially in regard to labor disputes, prescribes extreme care and insistence on the full indicia of due process in contempt cases. In such instances, not only must the District Court consider whether there is indeed a contempt but also whether if so, it be of such magnitude as to warrant retention, in part or to any extent, of the coercive fine originally provided for in contemplation of an out-

---

**6.** The mass action principle was first announced in this circuit, in *United States v. International Union, United Mine Workers of America*, 77 F.Supp. 563, 566 (D.D.C.1948), aff'd, 85 U.S.App.D.C. 149, 177 F.2d 29, cert. denied, 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949). There, the national union and its officers were enjoined from calling a strike. The union president sent a letter, apparently in code, to all local unions, after which 350,000 to 450,000 mine workers walked off their jobs. The court obviously believed that the leaders, though they avoided using the word "strike", were not engaging in a good-faith effort to comply with the injunction. The court noted that if someone other than the leaders took control of the union by a coup, the union would not be liable for contempt. 77 F.Supp. at 567.

**7.** "An appellate court may decide the merits of an appeal in the absence of fact findings in the rare case in which 'a full understanding of the issues [can] be reached without the aid of findings.' *Urbain v. Knapp Brothers Manufacturing Co.*, 6 Cir. 1954, 217 F.2d 810, 816, cert. denied, 349 U.S. 930, 75 S.Ct. 772, 99 L.Ed. 1260 . . . ." *Davis v. United States*, 422 F.2d 1139, 1142 (5th Cir. 1970).

**8.** *Cf. United States v. Brotherhood of Railroad Trainmen*, 96 F.Supp. 428, 432 (N.D.Ill.1951). When there was no cooperation from the rank and file of the union membership and "the great mass of the Union stayed out", the good faith efforts of the union leadership did not constitute a defense to the union's violation of an injunction against a strike. The judge did not, however, find the individual officers in contempt.

right refusal to obey. Flexibility in approach will permit consideration of the complexity of the outstanding order, possible ambiguities, the difficulties in arranging compliance and the extent of efforts to obey its terms. That a hearing on such aspects is or can be of great importance can scarcely be gainsaid."

The final contempt judgment against the Union and the $50,000 fine are vacated. On this issue, the case is remanded to the district court. The court may hear new evidence, if it deems proper; it shall also make full findings of fact, consider the Union's defenses, including good faith, and reconsider the fine to determine whether all or any portion of that fine should be imposed against the Union.

 On the contempt judgment and fine against Davis, we reverse. On May 4, when the district court found Davis in contempt, it did not set the penalty. The Transit Authority did not seek a final contempt judgment against Davis. Not until long after the strike ended did the court *sua sponte* fix the penalty at $100, which it then suspended. We believe that the May 4th contempt judgment was intended to be coercive, even though the trial court failed originally to set a conditional fine. But the district court had no jurisdiction to enter a final contempt judgment against Davis July 16, in the absence of a motion to that effect by the plaintiff. Judicial sanctions in a civil contempt proceeding are proper either to coerce compliance with the court's order for the complainant's benefit, or to compensate the complainant for losses sustained. *United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). In the civil contempt setting, the court has no independent interest in vindicating its authority should its orders be violated. A fine imposed by the court in the absence of a motion by the party in interest would transmute the proceeding into a punitive one for criminal contempt without the notice or procedural safeguards that a valid

prosecution for criminal contempt requires. The effective waiver of the complainant's interest removes the legal basis for imposition of civil contempt.[9]

Accordingly, the appeal from the preliminary injunction is dismissed as moot. The judgment dated July 16, 1974, holding the Union in contempt and fining it $50,000 is vacated and remanded to the district court for proceedings consistent with this opinion. The judgment dated July 16, 1974, holding Davis in contempt and fining him $100 (suspended) is reversed and ordered dismissed.

ROBB, Circuit Judge (concurring in the result):

My reading of the record convinces me that the Union was given a full and complete opportunity to present its defense of substantial compliance and that the defense was considered by the district judge. Having considered the evidence the district judge simply did not believe that the Union had in good faith done everything it should have done to bring the strike to an end. In my opinion the record supports the court's conclusion; certainly that conclusion was not clearly erroneous.

At the hearing on the motion to show cause on May 3, 1974 the court heard the testimony of Mr. Davis, President of the Union, Mr. Richmond, Secretary-Treasurer and Assistant Business Agent, and Mr. Sternstein, the Union Attorney. Thereafter the Union filed a long affidavit from Mr. Richmond setting out the activities of the Union with respect to the strike. Before entering his final order the court noted that he had read this affidavit. [J.A. 289] The court found Mr. Richmond not guilty of contempt, obviously on the ground that Mr. Richmond had in good faith behaved properly. I do not understand therefore how it can be said that the court did not consider the Union's defense.

It is apparent to me that the court believed the Union's alleged efforts to terminate the strike were half-hearted and not in

9. Contempt proceedings not involving the implementation of a conditional civil contempt order similarly terminate on settlement of the

main cause of which the contempt proceedings based on violation of an injunction were a part. 17 Am.Jur.2d § 49.

good faith. Thus the court did not believe that at the mass meeting of Union members on the night of May 3 Mr. Davis "urged them to return to work". On the contrary, the court pointed out [J.A. 186] that in his prepared statement to the members Mr. Davis said:

When this membership voted to go out on strike as of midnight, May 2nd, I told you then and I still believe that the strike was a lawful response to the company's unlawful failure to bargain in good faith and in compliance with the law and our 13–C agreement.

 \* \* \* \* \* \*

While I hate like hell to have to say this, unless and until that injunction is set aside, it does not make any sense for us to undertake the personal liability.

The court asked Mr. Davis, "In your opinion, is that encouraging the men back to work?" Although Mr. Davis responded "Yes" I think the court was entitled to find that the clear implication of the Davis remarks was that he did not really want the men to return to work. The record also shows that the Executive Board of the Union, which in a secret session on May 1 had voted to call a strike, did nothing to rescind that vote after the restraining order was issued and before a hearing on the contempt motion. [J.A. 178, 180] As for the charge that the Transit Authority interfered with the restoration of service, the record shows that the Authority quite properly insisted that the buses be driven by their regular drivers. The Authority could have reasonably believed that assigning drivers to routes or areas of the city with which they were not familiar would disrupt service.

The district judge had before him the uncontradicted affidavit of the Authority's Director of Transportation concerning the operations of the company during the strike. The Director stated:

During normal operations of the bus system the Washington Metropolitan Area Transit Authority provides 1553 buses during the normal weekday morning rush hours and 1548 buses during normal weekday evening rush hours. Normal operations on Saturdays consists [sic] of 384 buses and on Sundays 244 are in operation.

On May 2, 1974 (Thursday) only 12 buses were dispatched, and on Friday, May 3 only four buses were dispatched. On Saturday, May 4, 59 buses were dispatched, and on Sunday, May 5, 123 buses were dispatched. On Monday, May 6, 30 buses were dispatched. On Tuesday, May 7, 1,277 buses were operational. On May 8 normal services [sic] was restored.

These figures do not suggest any potent efforts by the Union leadership, before May 7.

Taking the record as a whole I think the District Court was justified in finding that the Union determined to skirt the provisions of the restraining order by prolonging the strike as long as possible. In reaching this conclusion as to the Union's good faith the court was entitled to consider the conduct and attitude of the Union officials both before and after the entry of the temporary restraining order.

Notwithstanding my view of the record I must acknowledge that the District Court did not "find the facts specially and state separately its conclusions of law thereon" pursuant to Rule 52(a), F.R.C.P. Accordingly I concur in the remand to give the District Court an opportunity to make such findings and conclusions. My concurrence of course is predicated upon the assumption that the majority is not directing the district judge to make any particular findings or reach any particular conclusions.