TWELVE JOHN DOES, et
al., Appellees,

v.

DISTRICT OF COLUMBIA, et
al., Appellants.

No. 87–5296.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 14, 1988.

Decided Aug. 26, 1988.

Edward E. Schwab, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, District of Columbia, Charles L. Reischel, Deputy Corp. Counsel, and Michael E. Zielinski, Trial Asst., Washington, D.C., were on the brief, for appellants.

Alan A. Pemberton, with whom Peter J. Nickles and John F. Seymour, Washington, D.C., were on the brief, for appellees.

Joseph E. diGenova, U.S. Atty., Michael J. Ryan, John D. Bates and John Facciola, Asst. U.S. Attys., entered appearances for Edwin A. Meese, III, Atty. Gen. of the U.S., Washington, D.C.

Before WALD, Chief Judge, and ROBINSON and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBINSON.

Concurring Statement filed by Circuit Judge STARR.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This case is yet another chapter in the long and unfortunate history of efforts to control overcrowding and improve conditions in the prison system of the District of Columbia.[1] The instant appeal is from an

---

1. The District maintains a Central Detention facility—better known as the "D.C. jail"—within its territorial boundaries, and a prison complex located in Lorton, Virginia. Three actions, each involving a distinct Lorton unit, have been consolidated in the District Court: *Doe v. District of Columbia*, Civ. No. 79–1726 (D.D.C.) (Maximum Security facility); *Twelve John Does v. District*

*of Columbia*, Civ. No. 80–2136 (D.D.C.) (from which this appeal stems) (Central facility); and *Inmates of Occoquan v. Barry*, Civ. No. 86–2128 (D.D.C.) (three Occoquan facilities). There also have been challenges to conditions at the D.C. jail. *Inmates of D.C. Jail v. Jackson*, Civ. No. 75–1668 (D.D.C.) and *Campbell v. McGruder*, Civ. No. 77–1462 (D.D.C.). This court has previ-

order of the District Court holding the District in contempt for exceeding the limit set by a consent decree on the number of inmates that could be incarcerated in the Lorton Central facility (Central). We affirm.

## I. THE BACKGROUND

On August 20, 1980, appellees, a class of inmates confined at Central, brought an action challenging as unconstitutional the conditions at the facility. After extensive discovery and negotiations, the parties reached agreement, the terms of which were incorporated into a consent decree, approved and entered by the District Court on April 28, 1982, which prescribed various improvements in the conditions at Central.[2] Of relevance here is Article IX, which imposed a population ceiling for that facility of 1,166 inmates, based on a standard of 60 square feet of sleeping space and 35 square feet of day-room space per prisoner, subject, however, to adjustment in the event that any dormitory space was closed or converted to other uses.[3] The decree reflected the understanding of the parties "that the elements of [the] [a]greement rest[ed] fundamentally on the number of residents committed to the Central facility," [4] but also recognized that that number "is a matter over which [the District has] little or no control...." [5]

The consent decree established a procedure for monitoring the District's compliance,[6] which we need only briefly summarize. The District was to provide appellees' counsel with monthly reports of population levels at Central. If, after reviewing these reports, counsel felt that the District was not abiding by the terms of the decree, they were to notify the District of the breach. The District was given two weeks to respond by either defending its actions or explaining the reason for noncompliance. If the response did not satisfy counsel, the parties were to meet within three weeks and attempt to resolve their differences. Either side was at liberty to apply to the court for assistance if agreement remained unattainable. The decree also supplied a means of bypassing this negotiation process if "counsel for [appellees] determin[ed] that there [was] imminent danger to the health or safety of the residents" in which event immediate recourse to the court was permitted.[7]

Since issuance of the decree, the District has periodically been out of compliance with its provisions, and counsel for the inmates have made several trips to the District Court to enforce its terms. The instant case was the upshot of one such journey, which occurred after the District in July, 1987, began to exceed the population maximum. At that time, Occoquan, another Lorton facility, was also under a court-imposed population restriction, and the Lorton administrators found it necessary to alleviate overcrowding at Occoquan by transferring some inmates incarcerated there to Central.[8] Almost immediately after receiving notice of the overcrowding resulting at Central, appellees moved for an order adjudging the District in con-

---

ously ruled on various aspects of these disputes. See *Inmates of Occoquan v. Barry*, 269 U.S.App. D.C. 210, 844 F.2d 828 (1988) (overturning population ceiling imposed responsively to allegations of Eighth Amendment improprieties at Occoquan facilities); *Twelve John Does v. District of Columbia (Does I)*, 268 U.S.App.D.C. 308, 841 F.2d 1133 (1988) (reversing order reinstating Attorney General as a defendant); *Campbell v. McGruder*, 188 U.S.App.D.C. 258, 580 F.2d 521 (1978) (holding overcrowding at D.C. jail violative of detainees' constitutional rights and affirming order to take steps to improve conditions).

2. Final Settlement and Consent Decree, *Twelve John Does v. District of Columbia*, Civ. No. 80-2136 (D.D.C. Apr. 28, 1982), Appendix for Appel-

lants (A. App.) 35–93 [hereinafter Consent Decree].

3. *Id.* at 54, A. App. 88.

4. *Id.;* see also *Does I, supra* note 1, 268 U.S.App. D.C. at 316–317, 841 F.2d at 1141–1142.

5. Consent Decree, *supra* note 2, at 55–56, A. App. 89–90.

6. *Id.* at 55–56, 57–58, A. App. 89–90, 91–92.

7. *Id.* at 58, A. App. 92.

8. The population cap set for Occoquan was eventually overturned by this court. *Inmates of Occoquan v. Barry, supra* note 1.

tempt, and requested a sanction of $250 per day for each dormitory at which the population limit was surpassed.[9] After a hearing on the motion, the court found the District in contempt for failure to observe the population cap and imposed the fine sought by appelles.[10] The present appeal followed.

## II. THE DISTRICT'S CONTENTIONS

The District maintains that the contempt adjudication is infirm because it lacks essential factual findings. The District insists that a significant increase in the number of inmates in the prison system has made it impossible to conform to the maximum-population specification, and that this constitutes a complete defense to the contempt charge. The District complains that this defense was rejected without benefit of specific findings on the issue.

The District also presses two additional arguments. First, the District asserts that a contempt adjudication was not an appropriate remedy because appellees ignored the negotiation procedure set out in the decree and went straight into court upon notification that Central's inmate population was excessive. Second, the District asserts that the maximum-population specification was never intended to be an absolute limit, but only a target figure which both parties knew might be impossible to maintain.

## III. THE TERMS OF THE DECREE

We may readily dispose to the District's arguments respecting appellees' alleged circumvention of the decree's negotiation provisions and the proper interpretation of

the maximum-population specification. The decree explicitly conferred upon appellees the prerogative to go directly into court if, in their counsel's estimation, noncompliance posed "imminent danger to the health or safety of [Central] residents." [11] That, counsel avow, is why litigation was favored over negotiation, and the reasonableness of that choice is not questioned. It is of no consequence that appellees did not expressly invoke this clause at the contempt hearing because the District did not challenge their right to be in court.

Contrary to the District's strained interpretation, it is clear that the maximum-population specification was designed as an absolute ceiling, violation of which would subject the District to a contempt charge. If this was not manifest from the original language of the decree, two subsequent amendments negated any uncertainty. The first prescribed that "[the District] shall reduce the total population of Central to the adjusted rated capacity established [by the decree]," and imposed automatic monetary sanctions for failure to comply within 90 days.[12] The second amendment reemphasized that "the maximum rated capacity of Central as a whole shall not be exceeded." [13] These unequivocal provisions remove any doubt that the population restriction was meant to be anything other than an unconditional command.

## IV. FINDINGS OF FACT AND THE IMPOSSIBILITY DEFENSE

The District Court unquestionably had power to hold the District of Columbia in civil contempt for violations of the consent decree.[14] Indeed, there is no dispute in this

---

**9.** Plaintiffs' Motion for Finding of Contempt and Imposition of Sanctions, *Twelve John Does v. District of Columbia,* Civ. No. 80–2136, A. App. 94.

**10.** *Twelve John Does v. District of Columbia,* No. 80–2136 (D.D.C. July 30, 1987) (order), A. App. 126.

**11.** Consent Decree, *supra* note 2, at 58, A. App. 92.

**12.** Consent Decree Amending Final Settlement Agreement and Consent Decree, *Twelve John Does v. District of Columbia,* Civ. No. 80–2136

(D.D.C. Aug. 18, 1983) at 8–9, Appellees Appendix (Ae. App.) 84–85.

**13.** Consent Decree Amending Final Settlement Agreement and Consent Decree of December 17, 1982 and The Amended Decree of August 18, 1983, *Twelve John Does v. District of Columbia,* Civ. No. 80–2136 (D.D.C. Mar. 4, 1985) at 8, Ae. App. 152.

**14.** See 18 U.S.C. § 401(3) (1982); *Interdynamics, Inc. v. Firma Wolf, Inc.,* 653 F.2d 93, 97 (3d Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Combs v. Ryan's Coal*

regard. Rather, the District argues that the contempt sanction was inappropriate because the circumstances it faced made compliance with the decree impossible. The District claims that it made every good faith effort to adhere to the numerical restriction, but that a significant increase in the number of inmates in the system prevented it from doing so. The District asserts that this impossibility furnishes a complete defense to the contempt charge.

After hearing argument on this point, the District Court orally acknowledged that prison officials had encountered "a very difficult time"[15] in conforming to the decree. But noting the long-term nature of the problem of endemic overcrowding in the District prisons, the court stated:

> [T]his has all been happening over the years. It hasn't suddenly occurred overnight. It was the duty of the District of Columbia to prevent its happening and to cope with it. And they haven't done so.[16]

The court then announced that it would hold the District in contempt.[17] A short written memorandum accompanied the contempt order, but did not elaborate further on the District's contention that compliance was impossible.[18]

We have repeatedly stressed the need for findings of fact when a colorable claim of impossibility is presented as a defense to a contempt motion.[19] The District relies on these pronouncements as ground for overturning the contempt order, claiming that it lacks findings sufficient to sustain it. This argument fails for two reasons.

■ First, although rulings on contempt motions fall within the requirements of Civil Procedure Rule 52(a) that district courts "find the facts specifically and state separately [their] conclusions of law,"[20] failure to do so does not destroy the jurisdictional basis for review.[21] As an appellate court, we may review the contempt decision without necessity for remand so long as " 'a complete understanding of the issues may be had without the aid of separate findings.' "[22] To be sure, the District Court's oral pronouncements are not a model of clarity and the absence of written findings has made our task more burdensome, but the court's conviction that the District had not done all within its power to avert overpopulations of Central is evident, and the court's disposition of the contempt motion is amply supported by both the history and the record of this litigation.

■ The District has for years been aware of recurrent overcrowding in its prisons, and has not taken steps adequate to eradicate the problem. The lengthy duration of this litigation and the frequency of inmates' resorts to the courts suggest a degree of intransigence on the District's part. Furthermore, the District has failed to build a sorely-needed new prison facility, or even to utilize fully the less burdensome measures available to it. No new halfway house space was added between September, 1986 and December, 1987.[23] Additionally, the District has only recently enacted into permanent law the Prison Overcrowding Emergency Powers Act of 1987, which allows the "Mayor to declare a state of emergency in the prisons whenever the

Co., 785 F.2d 970, 980 (11th Cir.), cert. denied, 479 U.S. 853, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986).

15. Transcript, Proceedings of July 30, 1987, at 66, A. App. 281.

16. Id. at 66–67, A. App. 281–282.

17. Id. at 67, A. App. 282.

18. See Twelve John Does v. District of Columbia, Civ. No. 80–2136 (D.D.C. July 30, 1987) (order & memorandum), A. App. 121.

19. Tinsley v. Mitchell, 256 U.S.App.D.C. 225, 227, 804 F.2d 1254, 1256 (1986); SEC v. Ormond Drug & Chem. Co., 238 U.S.App.D.C. 264, 266–

267, 739 F.2d 654, 656–657 (1984); WMATA v. Amalgamated Transit Union, 174 U.S.App.D.C. 285, 289, 531 F.2d 617, 621 (1976).

20. Fed.R.Civ.P. 52(a).

21. Clark v. Marsh, 214 U.S.App.D.C. 350, 354, 665 F.2d 1168, 1172 (1981).

22. Id. at 354, 665 F.2d at 1172 (quoting Swanson v. Levy, 509 F.2d 859, 861 (9th Cir.1975)); accord Louie v. United States, 776 F.2d 819, 823 (9th Cir.1985).

23. See Transcript Proceedings of Dec. 17, 1987, at 12–13, Ae. App. 318–319.

population of the prison system exceeds the rated design capacity for 30 consecutive days," and then to take specified steps to reduce sentences of designated inmates to alleviate overcrowding.[24] Finally, the District Judge has presided over various proceedings in this case for six years, as well as litigation over other local prison facilities, and is intimately familiar with the District's apathetic response to the problem. It is clear from her oral statements, viewed against the backdrop of the record as a whole, that she rejected the impossibility defense because in her well-informed estimation the District had not done all it could to comply. We will not disturb that conclusion.

Second, findings of fact are necessary only if a colorable claim of impossibility is presented. In the case at bar, the District urges a novel use of the defense. Heretofore, it has been invoked largely in circumstances in which it was literally impossible for a party to accomplish the court-ordered action—for example, where the litigant is financially unable to comply with a court order.[25] The logic underlying the defense is apparent. An adjudication of civil contempt is designed to coerce the contemnor to obey a judicial order. If he is unable to do so because of circumstances beyond his control, any attempt at coercion is pointless because it cannot produce the desired result.[26]

The record before us does not support the contention that it is impossible, in the traditional sense of the term, for the District to comply with the population ceiling. The District may well face political difficulties that prompt it to shun acquisition of the additional facilities needed to house the constantly increasing prison population, or dissuade it from taking other action to accommodate the overflow. Conditions such as these, however, do not establish a lack of power to alleviate the overcrowding, even if that means release of or refusal to accept prisoners. Since the contempt order under review may well have the intended effect of forcing the District to comply with the decree, it is not appropriate to countenance the District's disobedience.

In a similar situation, the Second Circuit refused to extend the impossibility defense to prison officials who had failed to abide by a court-ordered population cap.[27] The court pointed out that nothing prevented those officials from declining to accept more inmates until population requirements were met.[28] Thus, the court reasoned, because the contempt order would serve the goal of coercing adherence to the cap, it would be inappropriate to allow prison officials to escape its dictates by pleading impossibility.[29] In concert with the Second Circuit, we hold that the impossibility defense is inapposite to the situation presented here.

We do not gainsay the difficulty of the District's task. We share, however, the District Court's sentiment, albeit obliquely expressed, that the limits of judicial tolerance have been reached. It is our hope that, confronted by the prospect of heavy fines, the District will at last face up to its responsibilities and proceed to meet the obligations to which it agreed in the decree.[30] The order of the District Court is accordingly

*Affirmed.*

**24.** D.C. Code Ann. § 24–902 (1988 Supp.).

**25.** See, *e.g., Tinsley v. Mitchell, supra* note 19; *SEC v. Ormond Drug & Chem. Co., supra* note 19.

**26.** *Maggio v. Zeitz,* 333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476, 487 (1948) (contempt appropriate "only when it appears that obedience is within the power of the party being coerced by the order").

**27.** *Badgley v. Santacroce,* 800 F.2d 33 (2d Cir. 1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

**28.** *Id.* at 37.

**29.** *Id.*

**30.** The District's argument that the conditions at Central do not implicate the Eighth Amendment is of no avail. The District voluntarily agreed to the terms of the consent decree in lieu of litigating the constitutional issues raised by appellees' complaint. The requirements of the decree, not the Eighth Amendment, are the measure of the District's responsibilities. The District cannot unilaterally alter the terms of the decree in its endeavor to erect a defense to the contempt motion.

STARR, Circuit Judge, concurring:

I concur fully in Judge Robinson's opinion for the court. Prison litigation continues to befall the District Court with regularity, as revealed by both the daily newspapers and the growing docket of this court. I write only to emphasize one obvious point about this case: the issue here pertains to the District's non-compliance with the terms of a consent decree. *See* Maj.Op. at 878 n. 30. This case thus provides no occasion for consideration of issues that might well arise (and indeed have arisen) outside the setting of an *agreement* by parties to litigation.