Don TATE, et al., Plaintiffs,

v.

Richard FREY, et al.,
Defendants/Third–Party
Plaintiffs,

v.

George WILSON, et al., Defendants.

Civ. A. Nos. C 75–0031–L(A), C 79–0492–L(A), C 79–0570–L(A) and C 83–0254–L(A).

United States District Court,
W.D. Kentucky,
Louisville Division.

Oct. 16, 1987.

Eleanor Martin, David Friedman, Legal Aid Soc. of Louisville, Inc., Louisville, Ky., for plaintiffs.

R. Allen McCartney, Louisville, Ky., Barbara Jones, Gen. Counsel, Corrections Cabinet, Frankfort, Ky., W. Waverly Townes, Louisville, Ky., for defendants.

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION**

ALLEN, Senior District Judge.

This action is submitted to the Court for decision on the motion of the class action plaintiffs and defendant Richard Frey to hold the third party defendants, Commonwealth of Kentucky, by and through its Corrections Cabinet, George Wilson as Secretary of the Kentucky Corrections Cabinet, and Wardens Parke, Kassulke, and

Seabold ("The state defendants") in contempt of Court for violating the terms of an order and preliminary injunction of this Court entered in May 1983. A hearing was held on September 25 and October 2, 1987.

In May 1983, the Court ordered that the state defendants be prohibited from housing more than thirty of the state prisoners in the Jefferson County Jail at any time, and also ordered that no prisoner who was an inmate at the Jefferson County Jail be allowed to remain there for more than thirty days. This order and injunction were entered because of the overcrowding of the Jefferson County Jail.

▇ The evidence produced at the hearing reflects that since March 1987, the state defendants have been in constant and consistent violation of both phases of the order. As of the date of the last hearing, October 2, 1987, there were 197 state prisoners housed at the Jefferson County Jail, and the records show that many state prisoners were being kept in the Jefferson County Jail for more than the allowable thirty days.

The evidence also reflects that as of October 2, 1987, there were 48 technical parole violators[1] being held in the Jefferson County Jail without bond pending their preliminary hearing. It is the policy of the state to house these technical parole violators in the County Jail of the county in which they resided when their substantive offenses were committed. There is no statute or regulation that requires such a procedure.

While the state prisoners are housed at the Jefferson County Jail, they receive no classification from the State Correction System and, therefore, when taken by the state from the jail, they must go first to a maximum security institution to be classified. The statistics do not reflect how many of these persons would have been classified as being eligible for minimum security facilities.

The evidence is convincing that the inmates at the Jefferson County Jail are not only suffering from the overcrowding situation directly in that many of them are forced to sleep on the floor or on shelves, but that they also are compelled to forego the advantages offered by the state institutions, as compared to the jail, such as educational and training programs, the right to work in the state prison industry program and the opportunity to have more exercise and recreational opportunities. The evidence also reflects that there has been an increase in altercations and disciplinary incidents at the jail since March 1987.

The record also reflects that in order to prevent overcrowding at the jail, this Court has entered various orders which have resulted in certain types of misdemeanants serving less time than they would have had the overcrowding not existed. Also, Chief Judge Edward H. Johnstone has entered an interim order directing the County to place approximately 100 inmates with the Marion Adjustment Center and the jail has complied with that order.

The evidence is also clear that for some reason, or for no reason at all, the state has not made available to the Jefferson County inmates housed at the Marion Adjustment Center those programs which are made available to the state inmates who are housed there.

As far back as 1981, Chief Judge Johnstone entered orders placing caps on the population of inmates to be housed at the Kentucky State Penitentiary at Eddyville, the Kentucky State Reformatory at LaGrange, and the Women's Correctional Institution at PeWee Valley. No such order exists with reference to other correctional facilities owned by the state such as Northpoint, the farm centers, and Blackburn.

In addition to Judge Johnstone's orders and the orders of this Court, 12 state courts have entered orders placing a ceiling on the number of inmates to be housed in the county jails in which the circuit courts are located. Among these 12 orders are orders from circuit courts located in the most populous counties in Kentucky, such

---

1. The term "technical parole violators" as used herein refers to those persons charged with violation of terms of parole other than commission of additional criminal offenses.

as Kenton, Campbell, Fayette, McCracken and Graves.

The state defendants have been following a policy of treating all inmates held in state institutions, whether under court orders or not, on an equal basis insofar as admission into the state system is concerned. The sole exceptions are that the state chooses five inmates from Jefferson County and also gives priority to any inmate held in any county in Kentucky as to whom there exists a serious mental or physical or emergency problem.

The state defendants contend that it is factually impossible for them to comply with this Court's orders since the number of state held prisoners has increased substantially since 1981 and since the legislature has not supplied sufficient beds with which to house the growth in the criminal population. The state has provided for some 979 additional beds for housing of state prisoners over the past six years, but the evidence is that there are approximately 1100 state prisoners backed up in county jails throughout the state.

The state defendants also contend that any removal of prisoners by them from the Jefferson County Jail in any sizeable number would result in overcrowding at the institutions which are under the orders of Judge Johnstone and which already are filled to capacity.

Testimony was presented at the hearing indicating that the state defendants have a well-developed research unit and has also commissioned expert projections of inmate populations. The state defendants and the General Assembly were thereby placed on notice of the need to address the problem of overcrowding of the facilities without regard to court orders.

It should also be noted that the state defendants have complained about the increased burden that has been put on them because of the passage of what is known as the "seven deadly sins" statute. The state contends that this statute precludes inmates convicted of the offenses listed in KRS 197.140 from being classified as minimum security prisoners. However, Chief Judge Johnstone has held that the statute does not preclude such prisoners from being placed in minimum security institutions. The state has seen fit to obtain a stay of Judge Johnstone's order and appeal is pending before the Sixth Circuit Court of Appeals in spite of the fact that his interpretation would be of assistance to them with regard to the overcrowding problem.

Several cases have addressed the violation by various county and state authorities of court orders designed to prevent jail overcrowding. One of the leading cases is that of *Badgley v. Santacroce*, 800 F.2d 33 (2d Cir.1986). In that case, a consent decree was entered and an order issued by the Second Circuit Court of Appeals directing the district court to enjoin the county defendants from accepting any persons for confinement at the Nassau County Correctional Center until the inmate population had been reduced to 808 and thereafter from accepting any person if that person would increase the population above 808.

An amended consent decree was subsequently entered setting various caps on inmate population. On October 7, 1985 the county defendants began housing inmates at the corrections center above the in-cell limit of 710. For the next five and one-half months the in-cell maximum was met on only fifteen days. When a contempt motion was brought by the inmates, the district judge denied it on the grounds that it was impossible for the county officials to comply with the judgment without the assistance of state officials and on the grounds that they had made every reasonable effort to comply with the population limit.

The Court of Appeals in reversing stated that nothing made it factually impossible for the sheriff to cease delivering persons to the corrections center or for the warden to refuse to accept such persons until the population requirements were met. The court pointed out that political difficulties did not make it impossible for the defendants to stop adding more prisoners and stated that under New York law, where prison overcrowding renders a jail unsafe, application must be made to the state authorities for an alternate place of confine-

ment of inmates. See *Badgley, supra* at 37.

The court also pointed out that even if a state court did hold the defendants in contempt for refusing to house inmates at the corrections center, Supremacy Clause considerations require that the judgment of the federal court be respected. In any attempt by the state court to hold defendants in contempt, their taking the actions required by the judge of the district court would provide a complete defense. See *Badgley, supra* at 38.

Finally, the appellate court directed the district court to enter a judgment requiring the county defendants to give notice that the corrections center would be unavailable to house additional persons over the population cap except to the limited extent permitted by the amended consent decree. The court also ordered the district court to hold the county defendants in civil contempt in the event of any subsequent failure to implement paragraph 31 of the amended consent judgment and in that event to assess compensatory damages in favor of plaintiffs of not less than $5,000 for each person admitted to the corrections center in violation of the amended consent judgment and to order any additional remedies that might be appropriate.

■ The purpose of civil contempt is to compel a reluctant party to do what a court requires of him. The court's power to impose coercive civil contempt is limited by an individual's ability to comply with the court's coercive order. See *Shillitani v. United States*, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966); *Maggio v. Zeitz*, 333 U.S. 56, 72–73, 68 S.Ct. 401, 409–410, 92 L.Ed. 476 (1948). A party may defend against a contempt by showing that his compliance is factually impossible. *United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983). In raising that defense, the defendant has a burden of production that may be difficult to meet. *See Badgley, supra* at 36, citing *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 713 (D.C.Cir.1975) and *Aspira of New York, Inc. v. Board of Education*, 423 F.Supp.

647, 654 (S.D.N.Y.1976). This is particularly true where the defendants have a long history of delay and plaintiffs' needs are urgent. *Fortin v. Commissioner of Massachusetts Department of Public Welfare*, 692 F.2d 790, 797 (1st Cir.1982).

■ It appears to the Court that defendants Wilson and the Commonwealth of Kentucky through its Corrections Cabinet are not only in violation of our previous orders of May 1983 but also are in contempt of those orders. As to the three wardens, it would be unfair to find them in contempt since their only functions insofar as this case is concerned are to receive prisoners sent to them by the state. It is not shown that they have any control over the decisions to keep state prison inmates at the Jefferson County Jail, although they may act ministerially in response to orders issued them by the Corrections Cabinet and by Mr. Wilson.

The Court has many options open to it in enforcing a civil contempt. We believe that the following remedies are appropriate:

1. The state contemnors will be ordered to pay to the defendant Metropolitan Correctional Services Department a fine of $100 per day per state inmate in excess of 30 housed in the Jefferson County Jail after December 5, 1987.

2. The state contemnors will be ordered to pay a fine in the amount of $25 to each state corrections inmate in the Jefferson County Jail for each day the state prisoner population at the Jail exceeds the limit of thirty inmates, said provision to take effect as of December 5, 1987.

3. The state contemnors will be ordered to pay a fine in the amount of $25 per day to each state inmate who has been housed at the Jefferson County Jail for more than thirty days, such provision to take effect as of December 5, 1987.

4. The state defendants shall cease placing any technical parole violators in the Jefferson County Jail until such time as the population limits imposed by the Court are no longer being violated. By October 30, 1987, the state defendants are ordered to

remove all technical parole violators now held in the Jefferson County Jail. The state defendants shall not present any such persons for incarceration at the Jefferson County Jail until the defendants have brought themselves into compliance with the population caps and the incarceration duration limits of thirty days previously ordered by this Court.

Finally, the Court reserves the right to award attorney's fees to counsel for plaintiffs and for third party plaintiffs. Counsel may make appropriate motion at an appropriate time and submit affidavits and logs in support of their motions. The third-party defendants will have fifteen days to respond if an agreement cannot be reached as to the amount of attorneys fees. Plaintiffs and third party plaintiffs shall also recover their costs herein expended.

An order in conformity herewith has this day entered.