Nicholas A. PALMIGIANO, et al.

v.

Edward DiPRETE, et al.

Thomas R. ROSS, et al.

v.

Edward DiPRETE, et al.

Civ. A. Nos. 74–172 P, 75–032 P.

United States District Court,
D. Rhode Island.

April 6, 1989.

Alvin Bronstein, Nat. Prison Project—
ACLU, Washington, D.C., for plaintiffs.

George Cappello, Rhode Island Dept. of
Corrections, Cranston, R.I., David Dugan,
Rhode Island Atty. Gen.'s Office, Prov-
idence, R.I., for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

In this Court's Order of October 21,

1988,[1] defendants, Governor Edward Di-Prete and John J. Moran, Director of the Rhode Island Department of Corrections, were found to be in contempt of court for having failed to comply with certain provisions contained in standing orders of this Court regarding the conditions of confinement at the State's Adult Correctional Institutions (hereinafter "ACI"): the prohibition against housing pre-trial detainees in dormitories, the limitation on double-celling any pre-trial detainee for more than thirty days, and the population cap of 250 persons at the Intake Service Center[2] (hereinafter "ISC"), this last having been entered with the consent of the parties. Defendants were ordered to file with the Court by November 21, 1988 a specific and detailed plan, to be approved by the Court, which would ensure compliance with the enumerated provisions. The Court further ordered that the defendants might purge themselves of contempt by implementing, by February 20, 1989, their plan to comply with the standing orders. Finally, the Court ordered that, if defendants failed to file a plan with the Court by November 21, 1988 or if they failed to bring the ISC into compliance with the court orders by February 20, 1989, fines would accrue at the rate of $50 per day for each person held in the ISC in excess of the 250 population limit.

## I. PROCEEDINGS SINCE THE OCTOBER ORDER

### A. *The December 1988 Plan*

Shortly before the November 1988 filing deadline, defendants requested an extension of time within which to file the plan. By agreement of the parties, the deadline for submission was extended to December 30, 1988, on which date the plan was filed.

The plan, entitled "State of Rhode Island's Initiatives to Reduce the Inmate Population at the Intake Service Center" (hereinafter the "December Plan") outlined fourteen steps being considered by defendants and in various stages of development: some under consideration, several in the planning stage, others currently operating and one already rejected as not feasible. Of the fourteen initiatives presented, three involved facilities construction and renovation projects,[3] two involved proposals to increase staff,[4] five were program development projects,[5] two focused on the release of sentenced inmates,[6] one (already rejected as infeasible) was to relieve the especially severe overcrowding experienced at the ISC on weekends,[7] and the last in-

---

1. The Court's Opinion and Order is reported as *Palmigiano v. DiPrete*, 700 F.Supp. 1180 (D.R.I. 1988). Familiarity with this opinion is assumed.

2. The ISC was designed to house 168 persons—pre-trial detainees and newly-convicted offenders, the latter referred to as "admission and orientation" inmates (hereinafter "A & O inmates"). As long ago as 1985, corrections officials made plans to transfer these A & O inmates as a way of dealing with overcrowding at the ISC. Because of crowding in the ACI's facilities for sentenced inmates, however, the ISC has continued to house A & O inmates. Thus the severe overcrowding at the ISC has two components—growing populations of both pre-trial detainees and A & O inmates.

3. Construction and renovation projects proposed were the conversion of a building formerly used by the Department of Mental Health, Retardation and Hospitals into a new work release facility, the Bernadette Work Release Center; emergency construction and renovation at the maximum, medium, minimum, and work release facilities, funded out of the State's Asset Protection Fund; and capital development projects at the ISC and maximum, medium and industries buildings, funded by the State's Public Buildings Authority.

4. Increases in core and maintenance staff at the ACI and in the staffs of probation and parole were proposed.

5. New programs proposed to be developed were a home confinement program, a halfway house program, and a substance abuse treatment program. In addition, a Jail Based Notification Program (hereinafter "JENP"), specifically designed to reduce the length of confinement of persons awaiting trial through an array of services, was already operating with one staff person, and a new Pretrial Services Unit was proposed to expand the size and scope of the JBNP.

6. Defendants' December Plan included a proposal to increase the frequency of Parole Board meetings and a proposal to submit emergency early release legislation to the legislature.

7. Defendants had met with members of the state judiciary to explore the possibility of instituting

volved a population planning study and development of a computerized population projection model for the Department of Corrections.

Taken as a whole, these initiatives were designed to comprise what defendants termed "a system-wide approach ... to reducing the overcrowding at the ISC." As defendants explained:

> This approach includes expansion of options for the sentenced population as well as programs for the awaiting trial population. These options will create additional bedspace throughout the ACI and will also facilitate discharge of appropriate inmates from institutional confinement. In the case of the sentenced population, the chain reaction will reach all the way back to the ISC.... In the awaiting trial context, programs and planning are under way to address the size of [the] pretrial population.

December Plan, p. 3.

Viewed in terms of their potential to effect the court-ordered reduction in population at the ISC by the February 20, 1989 deadline, only one of the proposed initiatives, the removal of sentenced (A & O) prisoners from the ISC as a consequence of the opening of a new work release facility at the ACI, was touted by defendants as being able quickly to bring the conditions of confinement at the ISC into compliance. Describing the significance of the proposed Bernadette Work Release Center,[8] defendants explained:

> The opening of the Bernadette Building by February 15, 1989 will provide immediate bedspace for up to 225 inmates. This additional capacity will enable the Department to remove from the ISC the newly-sentenced inmates who have been held there for lack of bedspace elsewhere. Assuming that the pretrial population remains at the current level, these

initiatives will enable the Department to eliminate the use of dormitories for pretrial inmates and the double celling of inmates held longer than thirty days.... This activity will place the ISC in close proximity to a population level of 250.

December Plan, pp. 39–40.

Of the remaining initiatives, only four [9] were intended to impact directly the number of pre-trial detainees held in the ISC and none were offered as being able to reduce the ISC population to 250 by the February 1989 deadline. For example, although the Jail Based Notification Unit was operating at the time the December Plan was filed, and was in fact the only initiative aimed at reducing the ISC population actually in operation at the time of the plan's submission, it was staffed with only one person. Further, while defendants planned to expand these activities by creating an ACI Pretrial Services Unit staffed by three persons, this plan was not intended to be implemented until "as soon as possible after the beginning of the next fiscal year"—in other words, at some unspecified time after July 1, 1989. Similarly, the other two proposed initiatives directed at reducing the pre-trial population were far from fruition. A planned 192–bed expansion of the ISC, approved in the spring of 1988 by the Public Buildings Authority, was stalled pending the approval of the Cranston City Council. Further, defendants' "Timetable for Emergency Construction and Renovation Programs" appended to the December Plan showed that even in a best case scenario, if the architecture and engineering contracts were awarded on January 13, 1989, occupancy of the new area could not begin until February 1991. Finally, a proposed management study, designed to lead to the development of a computerized population projection model to assist with predicting and planning for growth in Rhode Island's prison, probation,

---

weekend court sessions to speed the movement of detainees through the ISC. However, even before the submission of the December Plan, the judiciary had rejected this idea as expensive and logistically impracticable.

**8.** The Governor, by Executive Order No. 88–15, had transferred the Bernadette Building from

the Department of Mental Health, Retardation and Hospitals to the Department of Corrections on December 19, 1988.

**9.** As noted above, another proposal to institute weekend court in order to speed the movement of detainees through the ISC was moot by the time the December Plan was submitted.

and parole populations, was not predicted to be completed until sometime in 1989.

## B. *The January 1989 Chambers Conference*

This Court expressed its reaction to the defendants' plan, by letter to the defendants dated January 23, 1989, thusly:

Although I find the comprehensive approach outlined in the plan to be very laudable ..., I also find that the proposals as they now stand appear to do little to alleviate the immediate overcrowding crisis at the I.S.C. At this stage in this crisis, *nothing will suffice to satisfy the October 21, 1988 Order of this Court except an immediate reduction of the population at the I.S.C....*

On January 31, 1989, the Court held a chambers conference to review the defendants' plan and to discuss exactly what defendants were doing to reduce the pre-trial detainee population by the court-ordered deadline of February 20, 1989. Throughout the conference, the Court stressed that defendants must supplement their long-term initiatives with short-term emergency measures designed to bring about an immediate reduction in the ISC population. As a result of the parties' agreement at the conference, the Court entered an order on February 13 allowing the defendants to proceed immediately to house 200–225 work-release inmates in the incompletely renovated Bernadette Building, provided that the building complied with specified safety regulations and that all sentenced (A & O) inmates were removed from the Intake Service Center by February 21, 1989. Furthermore, defendants were ordered to file a report with the Court by February 21, 1989 apprising the Court of the progress of their initiatives to reduce the ISC population and identifying whatever initiatives they would implement within the next three to six months to further reduce the ISC population.

## C. *The February 1989 Report*

Defendants did file the follow-up report on February 21, entitled "Defendants' Continuing Initiatives to Reduce the Penal Inmate Population at the Intake Service Center" (hereinafter the "February Report"), which reviewed defendants' progress toward implementing six of the fourteen projects originally proposed and announced one entirely new initiative.

The Report first documented the opening of the Bernadette Work Release Center, to which 172 work-release inmates had been transferred on February 15, and further reported that the opening of this facility "has permitted the Department to reclassify and transfer inmates throughout the system in order to provide space for sentenced inmates who were being held at the Intake Service Center." Indeed the opening of the Bernadette Building had enabled the Department to remove 127 inmates from the ISC between February 15 and February 18 and consequently to reduce somewhat the population of the facility. While there had been 476 people housed at the ISC (337 pre-trial detainees and 139 sentenced persons) on February 14, there were 390 people housed there on February 20 (343 pre-trial detainees and 47 sentenced persons).

With regard to the other projects first unveiled in the December Plan, defendants reported that legislation had been introduced in the Rhode Island General Assembly to establish home confinement as an alternative to incarceration or detention at the ACI not only for sentenced inmates but also for awaiting trial detainees unable to post cash bail of $5,000 or its equivalents within 48 hours of arraignment and accused of non-violent or non-drug-related crimes. In addition, a Request for Proposals to administer the program had been published on February 5, 1989, as was a Request for Proposals to implement and administer a halfway house for sentenced inmates. Although the tentative contract date for both projects was set for May 1, 1989, the Report demurred that "such necessary preliminaries as the enactment of suitable legislation, the acquisition of a site for the halfway house, equipment for electronic monitoring and staff for both programs will no doubt delay the ability of vendors to begin actual implementation for several months beyond this date." Third,

the funding of the proposed emergency construction and renovation projects with monies from the State's Asset Protection Fund had been approved, and an Invitation for Letters of Interest had been extended to architectural and engineering firms on February 21, 1989. Finally, consultants were scheduled to begin work on the proposed management study on March 6, 1989, with September 6, 1989 as the target date for completion of this study. Data pertaining to both the detainee and sentenced populations was being computerized, and this computerized data base would enable the development of a population projection model for the Department sometime in the summer of 1989.

The February Report also announced a brand-new initiative, Project Bail, a Rhode Island not-for-profit corporation whose mission would be to oversee the design and implementation of a bail fund to serve the awaiting trial population. The February Report explained that the non-profit corporation would contract with a service provider to administer a program to identify that portion of the awaiting trial population (hereinafter the "Target Group") eligible for the program, provide bail for those in the Target Group, supervise them to assure their attendance at trial, and utilize existing community resources to enable the bailed Target Group members to be employed, functioning citizens. The Report stated that, "Preliminary estimates indicate that up to 60 Target Group members will participate in the program at any one time." The Board of Directors was to raise the needed pool of capital from Rhode Island businesses and individuals and from local and national foundations. The Report stated that no public funds would be used for the capital, but that the State of Rhode Island, through the Department of Corrections, would provide operational funds. According to the Report, Governor DiPrete had asked that Project Bail proceed on an accelerated timetable so as to be fully implemented within six to seven months.

### D. The March 1989 Compliance Hearing

A compliance hearing was held on March 13, 1989. At the hearing, plaintiffs introduced population reports, from February 20 through March 5, showing that the ISC population had exceeded 250 on each day in that period, sometimes by as many as 156 persons. Plaintiffs also presented one witness, A.T. Wall, Assistant Director for Policy and Development in the Department of Corrections since 1987. Wall was questioned as to whether certain of the defendants' proposed initiatives to reduce overcrowding at the ISC could have been implemented one or two years ago. Testimony of A.T. Wall, Compliance Hearing Tr. 22–27. Wall stated that the actions regarding the bail fund could have been taken one to two years ago; that the home confinement legislation could have been introduced one to two years ago; that the Requests for Proposals for home confinement and halfway house programs could have been issued two years ago assuming that there were funds available to operate the programs; and that money for the emergency construction and renovation projects could have been sought from the State's Asset Protection Fund one to two years ago, but that funding could have been obtained from that source only if those monies were not already encumbered. Finally, although Wall stated that the planned management study would not have been possible two years earlier because the Department of Corrections did not have a computerized data base at that time, he also admitted that it was possible for the Department to have acquired the computerized data base itself as many as three or four years ago.

Defendants countered with the testimony of two witnesses, John Moran, Director of the Department of Corrections, and Sarah Dowling, Chief of Policy for Governor DiPrete. Director Moran, while admitting that the State had not succeeded in reducing the population at the ISC to 250 or in refraining from housing pre-trial detainees in dormitory settings by the February 1989 deadline, nevertheless described in detail the efforts that had been made by the Governor's Office and the Department of Corrections to achieve compliance with this Court's Order of October 1988. Moran

spoke about the opening of the Bernadette Building and its impact on the ISC population; other emergency construction and renovation to be undertaken to add additional space for the sentenced population; efforts to plan and fund Project Bail, the halfway house program and the home confinement program; and the progress of the management study. He further stated that no progress had been made on the permanent 192–bed expansion of the ISC or the construction of a new $30 million medium security facility because the projects, funded as they are with Public Buildings Authority monies, require the approval of local officials which had not been granted as of the date of the hearing. Having thus reviewed the State's efforts, Director Moran concluded that, in the four months from October 21, 1988 to February 20, 1989, "there were no other options" available to the Department of Corrections to reduce the ISC population to 250, keeping in mind considerations of public safety and the safety of the prison. Testimony of J. Moran, Compliance Hearing Tr. 51.

On cross-examination, however, Director Moran admitted that some of the initiatives undertaken in the four-month period—the home confinement and halfway house programs—could have been undertaken four years ago, and that Project Bail could have been initiated two years ago. Testimony of J. Moran, Compliance Hearing Tr. 55, 60. Moran refused to concede, however, that certain other initiatives could have been undertaken four years ago, arguing that unobligated Asset Protection Fund monies were not necessarily available to be allocated to emergency construction projects at the prison four years ago and that the Bernadette Building could not have been transferred to the Department of Corrections four years ago because it was still being used by the Department of Mental Health, Retardation and Hospitals. Testimony of J. Moran, Compliance Hearing Tr. 55. He also insisted that the expansion of the ISC did not need to be undertaken four years ago because, "The need, I don't believe, was there four years ago. I don't believe the numbers were as overwhelming as they are today." Testimony of J. Moran, Compliance Hearing Tr. 57. However, Moran conceded that conditions had grown serious two years ago and that it was possible to seek funds for the permanent expansion of the ISC at that time. Testimony of J. Moran, Compliance Hearing Tr. 57–59.

Dowling, who has been Chief of Policy only since February 1, 1989, was questioned only about the most recent progress toward accomplishing certain of the State initiatives. With regard to the home confinement legislation, Dowling stated that she had personally reviewed the legislation and that it had been introduced prior to the February 16, 1989 deadline for the introduction of legislation this term. Testimony of S. Dowling, Compliance Hearing Tr. 64. Turning to the bail fund, she reported that she also had recruited personally the members of the first Board of Directors and had attended the organizational meetings of the group. She stated that she anticipated that the bail fund would be fully operational within six months. Testimony of S. Dowling, Compliance Hearing Tr. 64–67. Finally, with regard to the expansion of the ISC, she stated that, because of the continuing problems of securing local approval of the project, the Governor had instructed her to "pursue other avenues of financing of the prison projects." Testimony of S. Dowling, Compliance Hearing Tr. 69. Dowling's testimony emphasized that the Governor has, since the October 1988 Order, made dealing with the overcrowding problem "his highest priority" and had instructed his senior staff "to proceed with all due speed and to resolve this problem." Testimony of S. Dowling, Compliance Hearing Tr. 70.

## II. IMPOSITION OF SANCTIONS UNDER THE OCTOBER 1988 CONTEMPT ORDER

### A. *Failure of State Defendants to Purge Themselves of Contempt*

■ Based on the evidence adduced at the March 13, 1989 compliance hearing, there can be no doubt that the state defendants, Edward DiPrete, Governor of Rhode Island, and John J. Moran, Director of the Rhode Island Department of Corrections,

have failed to purge themselves of contempt by bringing the ISC into compliance, by February 20, 1989, with the standing orders of this Court governing the conditions of confinement of pre-trial detainees at the ACI.

Although defendants did succeed in filing a plan with the Court by December 30, 1988, this plan was, in the main, a long-range plan designed to address the growing need for additional space throughout the ACI and was not the "specific and detailed plan" that this Court ordered defendants to craft to "ensure that the population of the present 168–cell ISC will be maintained at no more than 250 persons, that dormitory housing of detainees will cease, and that no detainee will be double-celled for more than thirty days." *Palmigiano*, 700 F.Supp. at 1199. *See generally* State of Rhode Island's Initiatives to Reduce the Inmate Population at the Intake Service Center, December 30, 1988. Indeed, rather than proposing emergency steps that could be taken immediately to reduce the ISC population to a level below the cap of 250, the heart of the plan was a combination of long-range construction and renovation projects and alternative sentencing programs designed to relocate or reduce the sentenced population of the ACI, which would in turn enable officials to move sentenced prisoners housed in the ISC into space then made available in the other ACI facilities, thereby ultimately resulting in a reduction of the number of persons housed in the ISC.[10] Thus, in the final analysis, only five[11] of the thirteen initiatives presented as viable in the December Plan were designed to impact directly the pre-trial detainee population at the ISC, and of these five, only one, the opening of the Bernadette Work Release Center, was held out as being able to effect the court-ordered population reduction by the February deadline.

While defendants did report, on February 21, 1989, that they had supplemented the December Plan with an additional initiative designed to reduce directly the pre-trial population,[12] only one of the many initiatives being pursued, the opening of the Bernadette Work Release Center, was able to be implemented before the February 20, 1989 deadline for compliance. And although the Bernadette Building was opened as planned in February 1989, by February 20th this initiative had already had its greatest impact on the population of the ISC, yet had failed to accomplish the predicted reduction to bring the population level near the cap. Testimony of A.T. Wall, Compliance Hearing Tr. 28–31; Testimony of J. Moran, Compliance Hearing Tr. 45. Accordingly, at the compliance hearing, defendants were forced to admit that the conditions of confinement at the ISC continued to violate the orders of this Court in that the population of the ISC is chronically and substantially over the cap of 250[13] and pre-trial detainees are routine-

---

**10.** As recounted above, defendants, in their introduction to the December Plan, took the position that "a system-wide approach" is "the key to reducing the overcrowding at the ISC." While this Court has no quarrel with defendants' long-range plan, and in fact finds it laudable, the truth is that defendants are today confronted with an overcrowding crisis that demands that emergency measures be taken even as defendants simultaneously work to implement more permanent solutions. Nothing less than an immediate reduction in the ISC population will suffice.

**11.** As noted above, chief among these was the opening of the Bernadette Building. In addition, the Jail Based Notification Program appeared to be having its maximum possible impact on the ISC population given its staff of one. The third, the ACI Pretrial Services Unit, was essentially an expansion of the JENP, to be implemented sometime after July 1, 1989. Two others, the 192–bed expansion of the ISC and a program of planning and data-gathering activities were clearly long-range projects. A sixth, weekend court, was determined not to be a viable option.

**12.** In the three weeks before the February 20, 1989 compliance deadline, Governor DiPrete announced the creation of Project Bail, "a public/private partnership to reduce prison overcrowding." In addition, a bill to establish the classification of home confinement for both sentenced inmates *and pre-trial detainees* was introduced to the Rhode Island General Assembly.

**13.** On February 20, 1989, the date set for compliance, the population of the ISC was at 390, 140 persons over the cap. On March 26, 1989, the most recent figures available to this Court,

ly housed in dormitories carved out of former program areas, among them the ISC library. Testimony of John J. Moran, Compliance Hearing Tr. 44, 61–62.

In light of the facts outlined above, this Court can only conclude that defendants have persisted in continuing violations of its orders regarding the housing of pre-trial detainees at the ISC and that these violations have been substantial. Because it would be unjust, however, to sanction defendants for non-compliance if compliance is beyond their power, I choose here to reconsider carefully the question of whether it is factually impossible for defendants to comply with this Court's orders before turning to the question of whether defendants' failure to purge themselves of contempt now warrants the imposition of sanctions.

## B.  *Possibility of Compliance*

■ As this Court made clear in its Opinion and Order of October 21, 1988, and reiterated at the March 13, 1989 compliance hearing, the only defense able to rescue defendants from the imposition of contempt sanctions in this case is that of factual impossibility. *See generally Palmigiano*, 700 F.Supp. at 1196–98; Compliance Hearing Tr. 76–80. The crux of the impossibility defense is, of course, a lack of power to carry out the orders of a court due to circumstances beyond one's control. Lack of power in the contempt context means a literal inability to take the steps necessary to comply with a judicial order or consent decree, not simply an unwillingness to take action because the contemnor perceives the steps that actually can be taken as politically costly or ideologically repugnant. *See Twelve John Does v. District of Columbia*, 855 F.2d 874, 877–78 (D.C.Cir.1988) (impossibility defense inapposite where District of Columbia had not done "all within its power" to avert prison overcrowding); *Badgley v. Santacroce*, 800 F.2d 33, 36–38 (2d Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987) (impossibility defense inappo-

site where county defendants' compliance is hindered by political difficulties rather than physical impossibilities); *United States v. State of Michigan*, 680 F.Supp. 928, 1053 (W.D.Mich.1987) (impossibility defense inapposite where state prison officials, commissioners of corrections and Governor had five steps that they could take within their lawful authority to maintain uncrowded conditions at the Consent Decree institutions). *See also Twelve John Does v. District of Columbia*, 861 F.2d 295, 300 (D.C.Cir.1988) (citing with approval ruling previously made in *Twelve John Does I*, 855 F.2d at 878, that "political obstacles do not reach the lack of power due to circumstances beyond one's control necessary to constitute an impossibility defense"). In addition, in the context of prison overcrowding litigation, impossibility has been interpreted by federal courts that have had occasion to consider the issue as inapplicable to cases where a party is presently unable to comply because it refused, at some earlier time when compliance was within its power, to exercise its lawful authority. *See Twelve John Does I*, 855 F.2d at 876–78 (significant increase in the number of inmates in the system is neither unforeseen nor unforeseeable and does not prevent District of Columbia from complying with population cap where District was for years aware of endemic overcrowding and did not take steps along the way adequate to address the problem); *Tate v. Frey*, 673 F.Supp. 880, 882 (W.D.Ky.1987) (where state defendants had a well-developed research unit and had commissioned expert projections of inmate populations, substantial increase in state prison population over six-year period did not excuse non-compliance with court-ordered population cap despite legislature's failure to authorize sufficient beds in which to house the growing criminal population and legislature's passage of statute mandating high security classification for certain prisoners). Against this legal backdrop, then, this Court will once again consider whether: (1) the state defendants in this action have the requisite legal authority to carry

---

the population stood at 473, 223 persons over the cap. At no time since the deadline has the

ISC population dipped below 380, or 130 persons above the cap.

out the orders of this Court with respect to overcrowding at the ISC; (2) there are any unanticipated circumstances beyond these defendants' control that make compliance literally impossible; and (3) there are any steps at all that defendants can take that would bring them into compliance.

### 1. Legal Authority to Reduce ISC Population

■ This Court need not belabor the obvious fact that, in Rhode Island, the executive branch of state government, through its Department of Corrections, has legal responsibility for all matters relating to the operations of the state prison system. *See generally* R.I.Gen.Laws Sec. 42–56–1 et seq. (1972 & 1984 Reenactment). The Department's legal authority broadly encompasses "... the custody, care, discipline, training, treatment and study of persons committed to state correctional institutions or on probation or parole...." R.I.Gen. Laws Sec. 42–56–1(a)(4), (b) (1972 & 1984 Reenactment). In addition, the discretionary authority of the Director of the Department of Corrections includes the power to undertake certain functions directly relevant to the overcrowding crisis at the ISC, specifically to:

(a) designate, establish, maintain, and administer such state correctional facilities as he deems necessary ...;

(b) maintain security, safety, and order at all state correctional facilities ...;

(q) establish and maintain programs of research, statistics, and planning, and conduct studies relating to correctional programs and responsibilities of the department;

(r) utilize, as far as practicable, the services and resources of specialized community agencies and other local community groups in the development of programs ...;

(s) make and enter into any contracts and agreements necessary or inciden-

tal to the performance of the duties and execution of the powers of the department, including but not limited to contracts to render services to committed offenders ...

R.I.Gen.Laws Sec. 42–56–10 (1976 & 1984 Reenactment). It is thus entirely correct for this Court to hold the executive branch of Rhode Island state government accountable for implementing court orders regarding the conditions of confinement at state penal institutions operating under its legal authority.[14] *Cf. Pinto v. Nettleship*, 737 F.2d 130, 132–33 (1st Cir.1984) (where Puerto Rican law delegated authority to manage the prisons to the Puerto Rican Corrections Administration, responsibility for taking steps to relieve prison overcrowding and provide sufficient number of guards did not rest on local prison administrator).

### 2. Unanticipated Circumstances Beyond Defendants' Control

Throughout this most recent round of litigation, defendants have implied that the overcrowding at the ISC was, in effect, unforeseen and unforeseeable, being linked to a rise of 17.9% in the Rhode Island prison population from December 31, 1987 to June 30, 1988. December Plan, pp. 1–2. Indeed, defendants' position, as articulated by Director Moran at the March 13, 1989 hearing, seems to be that there was no need to expand the ISC or otherwise address the overcrowding problem at the facility four years ago because the situation only recently rose to the level of an "emergency." Testimony of J. Moran, Compliance Hearing Tr. 56–57.

■ Defendants' attempt to portray the problems at the ISC as being of recent vintage shocks the sensibilities of this Court. Only five months ago, this Court recounted in voluminous detail the sorry history of overcrowding at the ISC and of

---

**14.** Defendants argue that they lack plenary power to appropriate funds or enact legislation relevant to relieving prison overcrowding. To the extent that such steps are necessary to address the present crisis, this Court simply cannot accept an analysis that portrays the Rhode Island

executive and the Rhode Island legislature as "two warring sovereignties," nor allow Rhode Island government's *"inter se* problems ... [to] excuse [its] legal commitments." *Twelve John Does II*, 861 F.2d at 299–300.

defendants' recalcitrance in failing to make any meaningful efforts to address the problem unless ordered to do so by the Court. *Palmigiano*, 700 F.Supp. 1180, 1183–90. The uncontrovertible facts are that the ISC has been over its design capacity from its very first day of occupancy in 1982; that by 1983, the ISC population had reached 250; that defendants witnessed explosive growth in the ISC population as long ago as 1985, when the population expanded by an alarming 30% over its 1983 level of 250; that defendants have been ordered repeatedly to address the chronic and serious overcrowding problem at the ISC;[15] that despite such orders defendants have regularly and for a substantial period of time been in violation of the court-ordered population ceiling at the ISC (Testimony of J. Moran, Compliance Hearing Tr. 57); and that defendant Commissioner has admitted in the past that but for the orders of this Court no meaningful progress would have been made to address the prison's problems (Testimony of J. Moran, Compliance Hearing Tr. 60–61). That overcrowding has become an issue at all ACI facilities in recent months, and that it may worsen in the near future at the ISC and other ACI facilities because of the effects of the passage in the November 1988 general election of a referendum denying bail to persons accused of certain categories of offenses,[16] are clearly beside the point. This Court simply fails to grasp the logic by which a problem recognized for years is rendered unanticipated because it has worsened. If anything, these facts support the conclusion, arrived at reluctantly by this Court, that defendants have been intransigent in failing to institute, five years or three years or even one year ago, careful long-term solutions to the problem. In short, given the years-long duration of overcrowding at the ISC and this Court's frequent admonitions to defendants to address the problem, I simply cannot find today that defendants are excused from compliance with the court-ordered population cap at the ISC by unforeseen circumstances beyond their control.

### 3. Steps Able to Effect Compliance

◼ Regardless of the foreseeability of the recent increases in the size of the prison population in Rhode Island, impossibility would still be available to them as a defense if there is literally nothing that defendants can do now to come to grips with the overcrowding problem. Looking to federal court precedent for guidance in evaluating this final element of the defense, this Court notes that in each case the presiding court was careful to review the record in the case and make detailed findings of fact as to whether there were specific steps that defendants had the power to take that would bring them into compliance.[17] Among the steps found to be available to state actors in other prison overcrowding cases involving a colorable claim of impossibility[18] are:

1. the construction of new prison facilities;

2. the creation of halfway house programs and/or the expansion of space in existing facilities;

3. the enactment of a Prison Overcrowding Emergency Powers Act empowering the executive branch to declare a state of emergency and release those prisoners held in excess of court-ordered ceilings;

4. declining to accept new prisoners until population caps are met; and

---

**15.** This Court explicitly ordered defendants to reduce the population at the ISC in January 1984, May 1986, October 1987 and October 1988.

**16.** Referendum Question 1. Proposition to Amend Article 1, Section 9 of the Rhode Island Constitution—Right to Bail (Joint Resolution 262), November 8, 1988.

**17.** In adjudging proposed solutions to prison overcrowding viable, federal courts have evaluated those steps in the light of such case-specific factors as the duration of the litigation and the frequency of plaintiffs' resort to the courts, the particular sub-group of the prison population implicated in the overcrowding and the particular state actors named as defendants, paying close attention to the scope of their authority.

**18.** *Twelve John Does I,* 855 F.2d at 877–78; *Badgley,* 800 F.2d at 37; *Tate,* 673 F.Supp. at 883; *State of Michigan,* 680 F.Supp. at 1049–50.

5. applying to other authorities for an alternate place of confinement.

As in the precedent on which we now rely, the record in this case similarly shows that defendants DiPrete and Moran are not without steps that they can take to relieve the overcrowding problem at the ISC. As detailed in Defendants' Continuing Initiatives to Reduce the Penal Inmate Population at the Intake Service Center, February 21, 1989, and corroborated and updated at the March 13, 1989 compliance hearing, defendants have actually taken, *since being held in contempt* on October 21, 1988, the following myriad specific steps to reduce the ISC population:

1. promulgated an emergency order transferring the Bernadette Building to the Department of Corrections for use as an additional work release facility, which led in turn to an institution-wide transfer of prisoners that netted the transfer of 127 sentenced inmates out of the ISC;

2. incorporated Project Bail, a not-for-profit corporation created to establish a bail fund for pre-trial detainees in the State of Rhode Island, appointed its first Board of Directors and initiated organizational meetings of the group;

3. introduced legislation into the 1989 session of the Rhode Island General Assembly to establish the classification of home confinement for certain categories of pre-trial detainees and sentenced inmates;

4. committed funds for the current fiscal year to developing alternatives to incarceration for the prisoner population, in the amount of $770,000 for home confinement services and $485,000 for a halfway house program;

5. requested and received proposals from service providers interested in managing home confinement and halfway house programs for the State;

6. allocated $15 million in Asset Protection Funds for emergency construction and renovation projects at the ACI, including renovations to the ISC, solicited letters of interest from architectural and engineering services, and forwarded to the Department of Administration a short list of six architectural firms;

7. hired consultants to study how the Department of Corrections can best meet the challenge of its growing prisoner population (the management study) and began the process of forming working committees to act upon the study's recommendations upon their receipt in August 1989; and

8. codified data on both pre-trial detainees and sentenced inmates needed to develop a computer-assisted population projection model for the Department.

In addition, testimony offered at the March 13th hearing established that the Governor has also instructed his staff to pursue other sources of funding to expedite the $16.2 million 192-bed expansion of the ISC approved in spring 1988, but since stalled by the State's inability to secure local permissions for the project as required by the Public Buildings Authority, the current source of the project's funds. Testimony of S. Dowling, Compliance Hearing Tr. 69, 74.

Clearly the record in this case shows that defendants are at long last proceeding with commendable speed to resolve the overcrowding crisis at the ISC. The commitment by the Governor of funds [19] and personnel to the problem's solution indicates a seriousness of purpose on the part of the defendants never before witnessed by this Court throughout the long history of this litigation. Indeed, for the first time since this Court issued an order to cease overcrowding at the ISC in January 1984, the executive branch of State government is

---

**19.** This commitment amounts to an impressive 23.8% increase in the budget of the Department of Corrections over the last fiscal year. Testimony of S. Dowling, Compliance Hearing Tr. 67–68.

exercising its power to create the innovative array of confinement options needed.

Despite, however, the respect I feel for defendants' recent efforts to reduce the ISC population, I cannot ignore the fact that this flurry of activity has come too late to bring defendants into compliance with the orders of this Court. Indeed, not only have defendants never succeeded in reducing the population of the ISC below the population cap of 250 or in ceasing to house pre-trial detainees in dormitories (Testimony of J. Moran, Compliance Hearing Tr. 61–62), but as of March 26, 1989, the last date for which this Court has population statistics, the number of individuals housed in the ISC stood at 473, twenty-three more than the previous high of 450 reached in October 1988 when the Court first felt compelled to hold defendants in contempt in order to avert disaster in a facility then being operated at more than 250% of its design capacity and 80% above the agreed upon population cap. More to the point, the steps that defendants have taken since being held in contempt in October 1988 are, by their own admission, steps that could have been taken years ago when overcrowding first became chronic at the ISC (*see generally* Transcript of the March 13, 1989 Compliance Hearing) [20]—and should have been taken in response to the repeated orders of this Court. This Court is baffled that defendants did not begin systematically implementing new construc- tion projects, alternative housing options, bail fund activities and population projection models years ago—before overcrowding at the ISC reached the crisis proportions of today.[21] In light of the many steps available to defendants, and the many years that this Court has given defendants to undertake such steps, I can only find today that compliance with the orders of this Court has long been within defendants' power and is not a factual impossibility.

Finally, of the steps now being taken by defendants, it is clear to this Court that at least one of them, Project Bail, used in conjunction with the opening of the Bernadette Building, had the potential to effect an immediate reduction of the ISC population to at or near the cap within the time for compliance.[22, 23] While the long-range planning that defendants are now beginning to undertake is laudable, the fact remains that this Court has ordered an *immediate* reduction in the ISC population. The dangerous condition of overcrowding at the ISC demands that defendants act *now* and not await the eventual solution promised by their long-term, system-wide approach. Since there is at least one step which, if pursued vigorously beginning in October 1988, could have brought defendants into compliance by the February 1989 deadline, I can only reiterate that compliance with the orders of this Court is and

**20.** Defendant Moran has been the Director of the Department of Corrections since 1978, defendant DiPrete the Governor of the State of Rhode Island since 1985.

**21.** This Court notes with displeasure that much of what has recently been done by defendants to effect reductions in the ISC population was done in the last three weeks before the February 1989 compliance hearing. Testimony of S. Dowling, Compliance Hearing Tr. 63–70. This eleventh hour response by defendants corroborates this Court's firm conviction that only the threat of coercive sanctions has motivated the parties to exercise their lawful authority and act to resolve the overcrowding crisis.

**22.** According to uncontradicted testimony at the compliance hearing, 42% of the pre-trial population on any given day is being held for want of $5,000 cash bail (or its equivalents) or less. Testimony of A.T. Wall, Compliance Hearing Tr.

19. Assuming a pre-trial population of 450, this would mean 189 candidates for release through a bail fund that targeted indigent detainees and a potential reduction of the pre-trial population to 261. With 140 housed in the ISC Annex, 120 detainees would be housed in the ISC itself, with enough room for the current A & O population of 125.

**23.** In addition, a second step originally proposed by defendants but later inexplicably abandoned, the introduction of emergency release legislation, could also have provided defendants with a potent tool for ensuring on a daily basis that the ISC is operating in compliance with the cap. Testimony of A.T. Wall, Compliance Hearing Tr. 13–14. Whatever defendants' reasons for deciding not to pursue this approach, this Court notes that this step is possible and has been the solution of choice in other overcrowding cases. *See Twelve John Does I,* 855 F.2d at 877–78.

has been within defendants' power and non-compliance cannot now be excused.

## C. *The Coercive Sanctions*

On October 21, 1988, this Court ordered that, if defendants failed to bring the ISC into compliance with the standing court orders by February 20, 1989, fines would accrue at the rate of $50 per day for each person held in the ISC in excess of the 250 population limit. Based on the population reports provided by defendants and on testimony at the March 13 hearing, it is uncontroverted that the ISC has not been brought into compliance with these orders. Additionally, this Court is satisfied that compliance is, and for at least two years has been, within defendants' power. Accordingly, the Court must now levy the fines set in October.

The Supreme Court has recognized that sanctions for civil contempt may be employed "for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). The fines imposed here are coercive in nature. In this context, "the court ... must consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Id.* at 304, 67 S.Ct. at 701. In structuring this Order, these factors have been foremost in my mind. I therefore impose the threatened fines at this time in order to avert impending disaster at the critically overcrowded ISC and to advance the goal of bringing the facility into compliance with the standing orders. Specifically, daily fines began accruing on February 20, 1989 and have continued accruing to the date of this Order. The total amount of fines thus accrued exceeds $289,000.[24] Rather than simply levying these fines, however, I am taking the further step of directing that a portion of the monies be applied directly to the task of effecting an immediate reduction in the population of the ISC.

■ A federal court may, in the exercise of its equitable power, order that fines it has imposed as sanctions for civil contempt be used to remedy the problem underlying the contempt finding. *See Local 28 v. EEOC*, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (approving district court's order that $150,000 fine be used to finance a fund designed to increase nonwhite membership in apprenticeship program and union, where district court had found that petitioners, union and apprenticeship committee, discriminated against nonwhite workers and had held petitioners in contempt for failure to comply with court-ordered affirmative action program). This power has also been explicitly recognized in the First Circuit in *Cabrera v. Municipality of Bayamon*, 622 F.2d 4 (1980). In *Cabrera*, the district court had imposed fines against a municipality following the mayor's failure to remedy inadequacies at a municipal dump. The Court of Appeals held that these fines were entirely justified and noted that:

> [T]he payment of fines is creating a sizeable fund that properly could be used to speed rehabilitation [of the dump] or compensate plaintiffs for the special damages they have suffered due to defendant's unjustified delay.... Should defendant persist in inaction or should no agreement between the parties materialize, the district court may consider further exercise of its equitable power, perhaps to order the rehabilitation plan to be carried out by an independent contractor paid from the fund created by the contempt fines.

*Id.* at 7–8.

Even more to the point, federal courts faced with prison overcrowding of crisis proportions have exercised their equitable powers to order that fines collected as contempt sanctions be used to pay the bail of indigent detainees, thereby effecting an im-

---

**24.** See Appendix for computation of population statistics at the ISC and of the fines accrued for the period February 20 through March 26.

mediate reduction in the population. In order to reduce the overcrowding in the County Jail in Mobile, Alabama, for example, a federal district court ordered that $150,000 of the $2 million in accumulated fines be used to provide fees for bail bonds for those pre-trial detainees who were too poor to pay the fee. *Mobile County Jail Inmates v. Purvis*, 581 F.Supp. 222, 224 (S.D.Ala.1984). Confronted with overcrowding in the Holmesburg Prison, a municipal facility in Philadelphia, Pennsylvania, the federal court there found defendants, city officials, in violation of its order and instructed them to provide funds to finance a bail program sufficient to obtain the release of at least 300 detainees in order to comply with a court-ordered maximum population. *Harris v. Pernsley*, No. 82–1847 (E.D.Pa. June 6, 1988) (unpublished order) (provided to defendants and Court as Appendix C to Plaintiffs' Prehearing Memorandum for July 1988 Hearing).

In keeping with the cited precedent, and in the exercise of its equitable power to use the fines it has imposed to remedy the problem underlying its contempt order, this Court hereby orders that $164,250 [25] of the more than $289,000 that has accrued since February 20 be paid to the Department of Corrections and earmarked for an Emergency Overcrowding Relief Fund. The monies in this Fund are to be used to provide bail for indigent pre-trial detainees, thereby effecting an immediate reduction in the population of the ISC. Plaintiffs long ago suggested that the fines collected in this case be used to fund a bail program, and defendants' failure to reduce the population of the ISC in the four months since this Court's last order has at last convinced me that such a step is now necessary to secure compliance. However, I will suspend the collection of the additional fines accrued from March 14 to the effective date of this Order at this time, while reserving the right to levy these fines if the $164,250 to be paid now proves to be insufficient to achieve substantial compliance with the Court's orders.

In addition, this Court further orders that the Emergency Overcrowding Relief Fund be used to provide bail for indigent detainees who have had bail set at $5,000 cash bail (or its equivalents) or less by ruling of the Superior or District Courts of the State of Rhode Island. Since it is not for this Court or anyone else to second-guess the decision of the judge who set bail, this Court will impose no restrictions on who among the low-bail population will be eligible for participation in the Emergency Overcrowding Relief Fund nor condone such restrictions being engrafted on by anyone other than the court that first imposed the bail. Detainees held for want of bail have already been judged eligible to be released until their trial dates upon the payment of a certain amount of money, and that judgment will be given effect without modification by the bail program. These pre-trial detainees are in jail only because they are too poor to make bail. By using the contempt fines to provide bail money for these individuals, it is anticipated that overcrowding can be substantially reduced with minimal intrusion into the administration of the ACI by this Federal Court.

Finally, this Court directs that the monies be utilized in such a way as to provide bail for the maximum number of people given the funds available, so as to have the greatest possible impact on reducing the ISC population and to maximize the value derived from this use of taxpayer dollars. To effectuate this provision of the Order, I recommend that bail first be provided for those pretrial detainees held for want of $1,000 cash bail (or its equivalents) or less; then for those held for want of $2,500 cash bail (or its equivalents) or less; and finally for those held for want of $5,000 cash bail (or its equivalents) or less; and within each category provided first for those who have been in jail the longest. Each person bailed must sign an affidavit of indigency, revealing personal assets and liabilities. Monies returned to this fund upon a bailed

---

**25.** This represents the fines accrued between February 20 and March 13, the date of the

compliance hearing.

person's appearance at trial will be used to provide bail to another detainee.

The Emergency Overcrowding Relief Fund is not meant to replace Project Bail, or any of the other initiatives planned by defendants, which the Court expects defendants to pursue in accord with the timeframes set forth in the December Plan and the February Report. Indeed this Court applauds Project Bail as an important part of defendants' comprehensive long-range plan to deal with overcrowding at the ISC and throughout the ACI. However, the current overcrowding cannot be allowed to continue or worsen during the six to seven month start-up period projected for Project Bail. The critical nature of this problem demands that a bail fund be implemented now.

When Project Bail is fully operative, the Emergency Overcrowding Relief Fund will be discontinued and any monies left in the Fund will be transferred to Project Bail. Admittedly, the Emergency Overcrowding Relief Fund lacks certain of the commendable features of Project Bail, such as providing supervision of those released on bail to ensure their attendance at trial and providing support services to enable the bailees to be employed, functioning citizens.[26] Yet while I do not contend that the Emergency Overcrowding Relief Fund is an ideal solution to the problems at the Intake Service Center, I find that it is an essential emergency measure necessary to relieve the pressures caused by severe overcrowding at the facility.

IT IS HEREBY ORDERED that, because defendants, Governor Edward DiPrete and Director John Moran, have failed to purge themselves of contempt in that they did not implement by February 20, 1989 a plan to reduce the population at the ISC to no more than 250 persons and to eliminate the housing of pre-trial detainees in dormitories, the fines that have accrued at the rate of $50 per day for each person held in the ISC in excess of the 250 population limit are levied against defendants.

IT IS FURTHER ORDERED that defendants must provide to the Department of Corrections $164,250 of the accumulated fines within 15 calendar days of the effective date of this Order, which funds will be used to finance an Emergency Overcrowding Relief Fund for the purpose of providing bail for indigent pre-trial detainees.

IT IS FURTHER ORDERED that payment of the balance of the fines, accrued from March 14 through the effective date of this Order, shall be suspended unless and until such monies are needed to effectuate the orders of this Court regarding the conditions of confinement at the ISC.

IT IS FURTHER ORDERED that the Department of Corrections shall commence providing bail funds for pre-trial detainees within 30 calendar days of the effective date of this Order, shall make every effort to bail as many pre-trial detainees as possible with the funds available, and shall continue to bail pre-trial detainees with monies returned to the Fund. The Department will submit a progress report to the Court and the parties every 10 calendar days, specifying the name, alleged offense, and amount of bail of each person for whom Emergency Overcrowding Relief Fund monies have been provided.

IT IS FURTHER ORDERED that the accrual of new fines will be suspended for six months from the effective date of this Order, at which time a compliance hearing will be held. By the date of the compliance hearing, the Court expects that defendants will have implemented the initiatives which they set forth in the December Plan and the February Report to bring the ISC into compliance with the Court's standing orders. Defendants must not rely only on the Emergency Overcrowding Relief Fund or Project Bail; they must move forward with alacrity on all fronts. Defendants are hereby put on notice that the Court will consider harsher sanctions if defendants are again found to be in contempt of court.

---

**26.** Defendants are free, of course, to implement whatever additional features they feel are necessary to ensure bailees' attendance at trial and to provide for their welfare while awaiting trial in the community.

In order to afford the defendants an opportunity to appeal this Order, this Order is suspended pending appeal.

## APPENDIX

### CALCULATION OF FINES ACCRUED SINCE THE COMPLIANCE DEADLINE [1]

The column marked "A & O" lists the number of sentenced persons housed in the Intake Service Center on the date shown, while "DETAINEES" lists the number of pre-trial detainees housed there. The column marked "TOTAL" lists the overall number of persons housed in the Intake Service Center on the date shown. "EXCESS" is the number of persons housed in the ISC beyond the population cap of 250. "FINE" is the monetary penalty incurred due to non-compliance on the date shown, calculated by multiplying the number of persons held in the ISC in excess of 250 ("EXCESS") on the given date by $50 per person. A "*" indicates data provided orally by a representative of the Department of Corrections.

| DATE | A & O | DETAINEES | TOTAL | EXCESS | FINE |
|---|---|---|---|---|---|
| February 20 | 47 | 343 | 390 | 140 | $ 7,000.00 |
| February 21 | 58 | 334 | 392 | 142 | 7,100.00 |
| February 22 | 58 | 334 | 392 | 142 | 7,100.00 |
| February 23 | 61 | 341 | 402 | 152 | 7,600.00 |
| February 24 | 54 | 328 | 382 | 132 | 6,600.00 |
| February 25 | 54 | 341 | 395 | 145 | 7,250.00 |
| February 26 | 51 | 352 | 403 | 153 | 7,650.00 |
| February 27 | 56 | 325 | 381 | 131 | 6,550.00 |
| February 28 | 54 | 329 | 383 | 133 | 6,650.00 |
| March 1 | 57 | 337 | 394 | 144 | 7,200.00 |
| March 2 | 65 | 315 | 380 | 130 | 6,500.00 |
| March 3 | 80 | 302 | 382 | 132 | 6,600.00 |
| March 4 | 80 | 318 | 398 | 148 | 7,400.00 |
| March 5 | 76 | 330 | 406 | 156 | 7,800.00 |
| March 6 | 83 | 309 | 392 | 142 | 7,100.00 |
| March 7 | 86 | 313 | 399 | 149 | 7,450.00 |
| March 8 | 85 | 321 | 406 | 156 | 7,800.00 |
| March 9 | 90 | 316 | 406 | 156 | 7,800.00 |
| March 10 | 99 | 308 | 407 | 157 | 7,850.00 |
| March 11 | 99 | 336 | 435 | 185 | 9,250.00 |
| March 12* | 97 | 345 | 442 | 192 | 9,600.00 |
| March 13 | 95 | 323 | 418 | 168 | 8,400.00 |

Total fines accrued from February 20 through March 13    $164,250.00

| DATE | A & O | DETAINEES | TOTAL | EXCESS | FINE |
|---|---|---|---|---|---|
| March 14 | 107 | 318 | 425 | 175 | 8,750.00 |
| March 15* | 112 | 321 | 433 | 183 | 9,150.00 |
| March 16 | 111 | 322 | 433 | 183 | 9,150.00 |
| March 17 | 109 | 318 | 427 | 177 | 8,850.00 |
| March 18 | 108 | 330 | 438 | 188 | 9,400.00 |
| March 19 | 108 | 335 | 443 | 193 | 9,650.00 |
| March 20 | 117 | 330 | 447 | 197 | 9,850.00 |
| March 21 | 123 | 325 | 448 | 198 | 9,900.00 |
| March 22 | 119 | 316 | 435 | 185 | 9,250.00 |
| March 23 | 131 | 315 | 446 | 196 | 9,800.00 |
| March 24 | 130 | 312 | 442 | 192 | 9,600.00 |
| March 25 | 125 | 336 | 461 | 211 | 10,550.00 |
| March 26 | 125 | 348 | 473 | 223 | 11,150.00 |

Total fines accrued from March 14 through March 26    $125,050.00

TOTAL FINES ACCRUED FROM FEBRUARY 20 THROUGH MARCH 26    $289,300.00

1. Data from March 27 through the effective date of this Order is unavailable at this time.